**FILED UNDER SEAL**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **ex rel.** | * | |
| **Paul Sovitsky** | * | |
| Attorney address: | * | |
| 606 Baltimore Avenue – Suite 201 | * | |
| Towson, MD 21204 | * | |
| **Plaintiff-Relator** | * | **Civil Action No.:** _____ |
| | * | |
| v. | * | **Civil False Claims Act** |
| | * | **Complaint Filed Under Seal Pursuant To** |
| **SOC LLC** | * | **31 U.S.C. § 3729, *et seq.*** |
| 3975 Virginia Mallory Dr. – Suite 200 | * | |
| Chantilly, VA 20151 | * | |
| **Defendant** | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

# COMPLAINT & REQUEST FOR JURY TRIAL

Table of Contents

| | |
|---|---|
| I.   The False Claims Act | 2 |
| II.   The Parties | 3 |
|    A.  Plaintiff-Relator | 3 |
|    B.  Defendant | 4 |
| III. The Contracts | 5 |
|    A.  WPS | 5 |
|    B.  WPS II | 6 |
|    C.  General Contractual Obligations Under WPS and WPS II Contracts | 7 |
| IV. False Claims Due to Defendant's Fraud | 9 |
|    A.  WPS Contract | 9 |
|       1.   Guard Force Fraud | 9 |
|          a.   Fraud In Level 2 English Level Proficiency Qualification | 10 |
|          b.   Fraud In Required Guard Experience Qualification | 12 |
|          c.   Fraud In Firearms Experience Qualifications | 14 |
|          d.   Fraud In Training | 15 |
|       2.   Fraud In Personnel Bios & Representations As To Qualifications | 19 |
|       3.   Fraud to Avoid Deductions | 21 |
|    B.  WPS II Contract | 22 |
|       1.   Guard Force Fraud | 22 |
|          a.   Fraud In Physical Readiness Tests | 22 |
|          b.   Fraud In Level 2 English Level Proficiency Qualification | 26 |
|          c.   Fraud in Firearms Qualifications | 28 |
|          d.   Fraud In Training | 31 |
|       2.   Fraud In Personnel Bios & Representations As To Qualifications | 33 |
|       3.   Fraud To Avoid Deductions | 38 |

| | |
|---|---|
| V.   Termination In Retaliation For Engaging In Protected Activity | 39 |
| VI. Jurisdiction & Venue | 52 |
| VII.Violations of Law | 52 |
| Count I – Violation of the False Claims Act: False Claims, 31 U.S.C. §3729(a)(1)(A) – on WPS Contract & WPS II Contract | 52 |
| Count II – Violation of the False Claims Act: False Statements, 31 U.S.C. §3729(a)(1)(B) – on WPS Contract & WPS II Contract | 54 |
| Count III – Defendant Concealed and Improperly Avoided an Obligation to Pay Penalties to the State Department in Violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(G) – on WPS Contract & WPS II Contract | 55 |
| Count IV – Violation of the False Claims Act: Retaliation against Relator, 31 U.S.C. §3730(h) | 56 |

Plaintiff-Relator Paul Sovitsky ("Relator") respectfully files this Complaint, in the name of the United States of America and its Government ("U.S.A.") as a result of the unlawful fraud that the Defendant, SOC LLC ("Defendant"), committed on a contract with the U.S.A. and its unlawful retaliatory termination of Relator after Relator objected to and reported the fraud. Defendant's conduct violated the Federal False Claims Act, 31 U.S.C. §3729 *et seq.* as amended. Relator requests that a jury decide all claims in this case.

## I.   THE FALSE CLAIMS ACT

1.  The False Claims Act (the "Act"), originally enacted in 1863 during the Civil War, was substantially amended by the False Claims Amendments Act of 1986 and signed into law on October 17, 1986. Congress enacted these amendments to enhance the Government's ability to recover losses sustained as a result of fraud against the United States and to provide a private cause of action for the protection of employees who act in furtherance of the purposes of the Act. Congress acted after finding that fraud in the federal programs and procurement is pervasive and that the Act, which Congress characterized as the primary tool for combating fraud in government contracting, was in need of modernization.

2.  The Act provides that any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for civil penalties for each such claim, plus three times the amount of damages sustained by the Government, including attorneys' fees. The Act allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on behalf of the Government and to share in any recovery. The complaint is to be filed under seal (without service on the Defendant) to enable the Government (a) to conduct its own investigation without the Defendant's knowledge, and (b) to determine whether to join the action.

## II.    THE PARTIES

### A.  Plaintiff-Relator

3.  Relator is an adult resident of the States of Maryland and Florida.

4.  Relator is a former employee of the Defendant.

5.  Relator was only a Maryland resident when employed by Defendant and when terminated by Defendant.

6.  Relator presently is considering moving permanently to Florida, but has not made the decision to do so.

7.  Relator served in the U.S.A. Army for nearly 30 years.

8.  After his active employment with the Army ended in 2005, Relator worked for private contractors providing protective services to U.S.A. citizens and workers in high threat locations overseas. For example, Relator worked at various locations in Iraq and Pakistan.

9.  Relator holds high secret security clearances.

10. Relator is a subject matter expert in firearms instruction, anti-terrorism training, and protective services training.

11. Relator was initially employed by another private contractor from 2005 through 2013 as a project manager.

12. Relator was subsequently employed by Defendant as OCONUS Training Manager from December 2013 to June 2019 when he was terminated in Maryland.

13. "OCONUS" is a term referring to a position held outside the continental U.S.A.

14. Relator's job duties for Defendant as an OCONUS Training Manager involved managing and supervising training of personal protection services, guard force, and support personnel and developing and implementing training plans for integration training and in-service training and firearms requalification of the personal protection services, guard force, and support personnel.

**B. Defendant**

15. Defendant is a for-profit corporation licensed, doing business, and regulated in the State of Maryland.

16. Defendant conducts business with the U.S.A. on government contracts where the work performed is within the State of Maryland. Defendant has a resident agent in the State of Maryland.

17. Defendant does significant business in Maryland with the U.S.A. in Maryland.

18. Defendant was Relator's employer.

19. Defendant was and is subject to the federal False Claims Act.

20. Defendant's evaluations of Relator were positive.

21. Defendant never issued Relator an unsatisfactory evaluation.

22. Defendant never formally disciplined or counseled Relator.

### III. THE CONTRACTS

#### A. WPS

23. In or around September 2010, the U.S.A., through the Department of State ("DoS"), awarded a contract to the Defendant, as part of DoS' Worldwide Protective Services Program. The U.S.A. has information on this contract award at www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=510481d9cc6330df06af3decbed 1696a&_cview=0.

24. This Contract hereinafter is referred to as "WPS".

25. The value of the WPS Contract with Defendant has been reported as close to $1 billion. *See* https://www.cbsnews.com/news/state-department-awarding-private-contractors-up-to-10-billion-to-safeguard-embassies/.

26. Under the WPS contract, Defendant was required to provide static security guards and emergency response services for U.S. Embassy grounds in Iraq.

27. Upon information and belief, Task Order 3 was the Contract vehicle under which Defendant billed and was paid for under the WPS Contract.

28. Relator was employed on the WPS Contract as the OCONUS Training Manager. Under the WPS Contract, his duties and responsibilities included supervising and managing training of the static security guards hired by Defendant and implementing training plans and administering firearms qualifications on the security guards.

29. In his job as the OCONUS Training Manager, Relator supervised Defendant's training coordinators, integration & training instructors, range masters, and firearm instructors.

30. Under the WPS Contract, Relator was responsible for activities both at the Baghdad Diplomatic Support Center ("BDSC") located in the Baghdad International Airport and at the Baghdad Embassy Security Forces ("BESF") located in the U.S. Embassy grounds in Iraq.

31. In February 2016, the DoS issued an audit report based on Defendant's 2014 staffing reports and billings to the DoS. The report is titled: "Audit of Bureau of Diplomatic Security Worldwide Protective Services Contract Task Order 3 – Baghdad Embassy Security Force".

32. The Report uncovered fraud by Defendant and corrective action was ordered and agreed to by Defendant.

33. However, unknown to the DoS and U.S.A., the fraud continued.

**B. WPS II**

34. In or around February 2016, the U.S.A., through the Department of State ("DoS"), awarded a contract to the Defendant, as part of DoS' Worldwide Protective Services Program. Information set forth at this contract award to Defendant is at www.fbo.gov/index?s=opportunity&mode=form&tab=core&id=6815415435febe3259fdc5ed7f6 07800&_cview=0.

35. The value of this Contract award has been stated as $4,586,828,659.00. *Id*. This Contract hereinafter is referred to as "WPS II".

36. Under the WPS II Contract, the Defendant's work for the U.S.A., by task order, was divided into two distinct and separate work sites – the Baghdad Diplomatic Support Center ("BDSC"), at the Baghdad International Airport, and the Baghdad Embassy Security Forces ("BESF"), on the U.S. Embassy grounds.

37. Under the WPS II Contract, Relator continued to work for Defendant as the OCONUS Training Manager. However, the scope of his work was limited to the Baghdad Embassy Security Forces ("BESF") at the U.S. Embassy.

38. Upon information and belief, Task Orders 3 and 4 were the Contract vehicles under which Defendant billed and was paid for under the WPS II Contract.

39. Defendant invoiced and billed the U.S.A. under both WPS and WPS II.

40. The U.S.A. paid Defendant based on Defendant's bills and invoices.

**C. General Contractual Obligations Under WPS and WPS II Contracts**

41. The WPS Contract summarizes Defendant's contractual obligations as follows:

> The Contractor shall provide the Department of State's (DOS') Bureau of Diplomatic Security (DS) Office of Overseas Protective Operations with personal protective and static guard service support at worldwide locations worldwide, primarily in hostile and austere environments. The Contractor shall provide the necessary services, equipment, supplies, personnel, facilities, and other work described in this contract and resultant task orders. The name of the contract is Worldwide Protective Services (WPS) Contract.

*See* WPS contract, Section B, Supplies Or Services And Prices/Costs, at 2.

42. The WPS Contract summarizes the Defendant's scope of work on the Contract as follows:

> [Defendant] shall provide the following types of services under this contract, and as further specified in each Task Order issued under this contract:
>
> • Recruiting, screening, and selecting applicants for labor categories cited under this contract (See Section C.4.3.1).
> • Provide training and deployment of all labor categories cited under this contract. (See Section C.4.3.2).
> • Plan, manage, and perform personal protective, static guard and emergency response team security services (See Section C.4.2).
> • Provide mobile (in-transit) details, including walking, ground transportation, waterborne transportation, and airborne transportation.
> • Provide intelligence data for security operations (See Section C.4.3.4).
> • Provide translator/interpreter services (See Section C.4.3.5).
> • Provide medical services (See Section C.4.3.6).
> • Provide guard services (See Section C.4.3.7).
> • Support special overseas or domestic security assignments (See Section C.4.4).

• Plan, manage and provide logistics support for the Task Order, including vehicle support as authorized by the Contracting Officer (CO) or COR and/or GTM (See Section C.4.3.10).
• Plan and support contract transition efforts (See Section C.4.5).
• Plan and execute the construction of safe, functional work-site and residential facilities.
• Provide explosive detection (EDD) support services.
• Provide surveillance detection services.
• Provide Explosive Ordnance Disposal (EOD) services

*See* WPS contract, Section C, Statement of Work, at 5-6.

43. The WPS II Contract summarizes Defendant's contractual obligations as follows:

The primary objective of this contract is to secure best-in-class and on-time delivery of those [Defendant]-provided resources and services [Department of State] deems necessary to meet [Department of State's] global security and protective responsibilities. It is through a strong Government and [Defendant] partnership that this important overall security objective can most effectively be achieved.

*See* WPS II contract, Section C, Statement of Work, at 7.

44. The WPS II Contract summarizes Defendant's scope of work on the Contract as follows:

A. The [Defendant] shall put into operation the total work effort needed to satisfy the operational and technical requirements of this contract and resulting TOs. At a minimum, this work effort includes the following:

1. Ensuring the safety and security of the Department's facilities, buildings, property and employees and their accompanying eligible household members, as well as any DS/RSO-designated US and foreign government dignitaries, diplomats, officials, employees, and others.

2. Furnishing fully trained and qualified candidates who are suitable to be granted a national security clearance or public trust certification by the Department, as required.

3. Ensuring required staffing levels are met with DS/OPO/WPS-approved Contractor personnel in accordance with the timeframe(s) established in the applicable TO.

4. Ensuring that DS/OPO/WPS-approved personnel are available to prevent any disruption in service during adverse events (e.g., labor disputes, civil unrest, acts of nature, attacks, etc.).

5. Establishing internal policies, procedures, and processes for use by Contractor personnel performing work under this contract in accordance with this contract and the resulting TO(s).

6. Establishing well-defined and understood lines of authority, responsibility, and accountability for Contractor personnel performing work under this contract.

7. Providing quality program management oversight and assurance.

8. Performing all examinations, inspections, and tests necessary to determine whether the services, equipment, supplies, and material to be offered for acceptance by the Government conform to contract requirements. The Government will also perform inspections to ensure that such services, equipment, supplies, and material conform to prescribed requirements.

9. Delivering timely, complete, and accurate reports to the Government per the requirements in this contract and the resulting TO(s).

10. Accomplishing the required work either in an independent manner or in cooperation with the Government, Government-furnished Contractor resources, and other US and host nation agencies.

*See* WPS II contract, Section C, Statement of Work, at 9.

45. The billing and payment obligations of the WPS Contract were set forth in WPS Contract, Section B, Supplies Or Services And Prices/Costs and relevant Task Orders.

46. The billing and payment obligations of the WPS II contract are set forth in WPS II Contract, Section B, Supplies Or Services And Prices/Costs and relevant Task Orders.

## IV.    FALSE CLAIMS DUE TO DEFENDANT'S FRAUD

### A.  WPS Contract

#### 1.  Guard Force Fraud

47. The U.S.A. paid Defendant for providing a guard force consistent with the WPS contract terms.

48. Defendant typically hired non-U.S. personnel to work as guards and senior guards. The persons are referred to as "third country nationals" ("TCN") in the WPS contract. *See* WPS contract, Section C, Statement of Work, at 15.

49. As part of the WPS contract, Defendant was required to employ only guards whom satisfied certain requirements.

50. These requirements included, and were not limited to:

- Guards having at least "Level 2 English level proficiency" as set forth in the WPS Contract.

- Guards having a certain amount of military, law enforcement or guard force experience, as set forth in the WPS Contract.
- Guards having familiarity with Contract-issued weapons, as set forth in the WPS Contract.
- Guards having sufficient training to satisfy Qualifications, as set forth in the WPS Contract.

    a.   Fraud In Level 2 English Level Proficiency Qualification

51. The WPS Contract had a clear and unequivocal language requirement for guards.

52. The WPS Contract in Section J, Exhibit C, Personnel Responsibilities and Qualifications, §7.4 Senior Guard (SRG) (G) (OCONUS) (Non-PSS Qualified), provided that senior guards had to have at least "Level 2 English language proficiency (see Exhibit A)."

53. The WPS Contract in Section J, Exhibit C - Personnel Responsibilities and Qualifications - §7.5 Armed Guard (Male/Female) (AG) (G) (OCONUS) (Non-PSS Qualified) provided that non-senior guards had to have at least "Level 2 English language proficiency (see Exhibit A)."

54. The WPS Contract in Section J, Exhibit A, §1.04 - Language Skill Level Descriptions for all Contractor Personnel, defined "Level 2 English language proficiency" as follows:

> **Speaking Level 2** (Limited Working Proficiency)
> a. Able to satisfy routine social demands and limited work requirements.
> b. Can handle routine work-related interactions that are limited in scope.
> c. In more complex and sophisticated work-related tasks, usage generally disturbs the native speaker.
> d. Can handle with confidence, but not with facility, most normal high-frequency social conversational situations, including extensive but casual conversations about current events, as well as work, family, and autobiographical information.
> e. The individual can comprehend most everyday conversations, but has some difficulty understanding native speakers in situations that require specialized or sophisticated knowledge
> f. The individual's utterances are minimally cohesive to articulate basic concepts.
> g. Linguistic structure is usually not very elaborate and not thoroughly controlled; errors are frequent.
> h. Vocabulary use is appropriate for high-frequency utterances, but unusual or imprecise elsewhere.

55. The WPS Contract in Section J, Exhibit A, §1.04 - Language Skill Level Descriptions for all

Contractor Personnel, provided examples of "Level 2 English language proficiency" as follows:

> **Examples:**
> a.  While these interactions will vary widely from individual to individual, the individual can typically ask and answer predictable questions in the workplace and give straightforward instructions to subordinates.
> b.  The individual can participate in personal and accommodation-type interactions with elaboration and facility; that is, can give and understand complicated, detailed and extensive directions and make non-routine changes in travel and accommodation arrangements.
> c.  Simple structures and basic grammatical relations are typically controlled; however, there are areas of weakness.
> d.  In the commonly taught languages, these [areas of weakness] may be simple markings such as plurals, articles, linking words, and negatives, or more complex structures such as tense/aspect usage, case morphology, passive constructions, word order, and embedding.

56. Defendant breached the terms of the WPS Contract and defrauded the U.S.A. by employing

guards that did not meet the level 2 English proficiency qualification.

57. Relator possesses personal knowledge that a large percentage of Defendant's TCN's guards

did not have level 2 English proficiency.

58. A few examples include:

- In or around 2015, a guard was leaving Relator's office after receiving remediation training after failing to weapons-qualify. Relator wished the guard "good luck at the range today". The guard replied by talking about the "blue" color and did not understand "good luck".
- In or around 2015, Relator witnessed a Range Master speak to a guard who was confused where he was supposed to be. The Range-Master told the guard that he should be at "shooting lane 13". The guard was clueless, did not understand, and responded with his name "Rodriguez". The Range Master and Relator had to walk over to the guard and physically move him to lane 13.
- In or around 2016, Relator witnesses Integrated Training Instructor teaching a group of four African guards on shooting when they about three yards away from the target. The Training Instructor told them about the need to be precise with their aiming because they were only three yards from target. Relator saw that the guards did not understand the basic direction given by Training Instructor. Relator then approached the guards, and they indicated that they did not understand.

- In 2016, nine Peruvian guards did not understand basic instructions and went to a wrong room for a scheduled training and sat in the wrong room for hours without asking for help because they could not seek assistance in English.
- In or around 2016, Relator had to use a Hispanic Deputy Operations Manager – Facilities and Support to translate instructions in Spanish to a Peruvian TCN guard who did not understand English during a remediation.
- Relator speaks and understands Hindi. He had to translate his own instructions in Hindi to TCN guards from India who did not understand English.
- Around the same time in 2016, Relator used an African guard who can understand English to translate his instructions to most of the other African TCN guards who did not understand his instructions.
- In 2016 and 2017, the TCN guards did not even understand basic firearm commands such as commands relating to loading and unloading weapons.
- In 2016 and 2017, many of the TCN guards were disqualified from the firearm range because they fired their weapons wrongly and not per the instructors' specific instructions because they did not understand English.

59. Relator reported to Defendant about the TCN guards' failure to have level 2 English proficiency, stated that the lack of this qualification made weapons training difficult, and cautioned that the lack of this qualification posed safety risks.

60. Defendant did not take the corrective action it promised to the U.S.A. following the audit because guards did not possess the required English proficiency qualification.

   b. Fraud In Required Guard Experience Qualification

61. The WPS Contract mandated that the TCN guards had military, law enforcement, or guard force experience.

62. The WPS Contract in Section C, Statement Of Work, C.4.3 NECESSARY CONDITIONS, C.4.3.1 RECRUITMENT, SCREENING, SELECTION OF PERSONAL PROTECTIVE SERVICE AND PPS SUPPORT SERVICES APPLICANTS, C.4.3.1.1 RECRUITMENT, stated that; "The Contractor Shall: … • Recruit Qualified Applicants For Various Personnel Positions."

63. The WPS Contract in Section J, Exhibit A, Article V. Contractor Screening of Applicants, stated that: "The Contractor shall complete the actions and steps in the following process in connection with the screening of applicants."

64. The WPS Contract in Section J, Exhibit A, Article V. Contractor Screening of Applicants,

Section§ 5.01, Contractor Screening, specifically required that:

> The [Defendant] shall conduct a thorough screening of individuals accepted by the COR
> for the screening process. The Contractor's screening process shall include, but not be
> limited to:
> a. Available past work history.
> b. Police records check, if available.
> c. Review of DD 214, if applicant has former military service.
> d. Credit Check.
> e. Psychological screening.
> f. Physical fitness determination as specified in Section 1.
> g. Medical check-up, including stress test.
> h. And a thorough review of the bio submitted to the COR, Program Office, and/or
> DSHTPOPS to ensure 100% accuracy and compliance with requirements.

65. The WPS Contract in Section J, Exhibit C, Personnel Responsibilities and Qualifications - §7.4

Senior Guard (SRG) (G) (OCONUS) (Non-PSS Qualified), required that Senior Guards:

> Must meet all of the below qualifications:
> a. U.S. /TCN/LN.
>
> b. Level 2 English language proficiency (see Exhibit A).
>
> c. Able to demonstrate expertise in physical security and access control matters.
>
> d. Prior military experience such as that obtained by a NCO, or equivalent law
> enforcement or civilian security experience.
>
> e. Minimum of 5 years of mid-level military, similar police, or local guard force
> supervisory experience 3 years of which were at the NCO or equivalent level.
>
> f. Familiar with contract issued weapons.

66. The WPS Contract in Section J, Exhibit C - Personnel Responsibilities and Qualifications -

§7.5 Armed Guard (Male/Female) (AG) (G) (OCONUS) (Non-PSS Qualified), required that non-

Senior Guards had to have at least "Three (3) years of military or similar police or local guard

force experience."

67. Defendant breached the terms of the WPS Contract and defrauded the U.S.A. by employing

guards that did not possess the required experience.

13

68. Defendant's screening process was intentionally or recklessly ineffective, a sham, and noncompliant with WPS Contract terms.

69. Relator possesses first-hand personal knowledge that a large percentage of Defendant's TCN's guards did not have the required experience.

70. A few examples include:

- Many African TCN guards indicated that they had never handled a pistol or machine gun before.
- Many TCN guards were clueless on basic rules of shooting.
- Many guards failed because they had no, or very little experience and could not be trained.

c. Fraud In Firearms Experience Qualifications

71. The WPS Contract required that all guards be "familiar with contract issued weapons." See Section J, Exhibit C, Personnel Responsibilities and Qualifications - §7.4 Senior Guard (SRG) (G) (OCONUS) (Non-PSS Qualified) and §7.5 Armed Guard (Male/Female) (AG) (G) (OCONUS) (Non-PSS Qualified).

72. The WPS Contract at Section C, Statement of Work, §C.4.3.7.1(j) Guard Services - General, required the Defendant to "Ensure that all guards qualify with required weapons systems prior to performing work."

73. Additionally, the WPS Contract set forth a pre-employment requirement in Section J, Exhibit A, Article I. General Qualifications, § 1.03 General Qualifications for Local (Host Country) and Third-Country Nationals, that one:

g. Must be qualified and current in weapons normally carried by law enforcement officers, e.g., semi-automatic pistol, rifles, sub-machine guns, and shotguns. Firearms currency shall be certified by contractor prior to use of foreign nationals on protective or guard details.

74. Defendant breached the terms of the WPS Contract and defrauded the U.S.A. by employing TCN guards that did not possess the required firearms experience.

75. Defendant's screening process was intentionally or recklessly ineffective, a sham, and noncompliant with WPS Contract terms.

76. Relator possesses personal knowledge that many of Defendant's TCN's guards did not have the required firearms experience.

77. A few examples include:

- TCN guards did not know how to maintain and load ammunition into firearms.
- TCN guards pointed loaded weapons at others when training.
- A guard indicated to Relator that he had never shot a gun and that his only "guard" experience was standing in front of a library in Kenya with an AK-47 without bullets.
- In or about 2015, a TCN guard shot a person's a knee cap, at the VIP access gate because he did know how to unload his Glock19.

78. Relator and his subordinates removed from Contract many TCN guards for not qualifying on the shooting range.

79. Relator and his subordinates saw that many TCN guards did not have the required familiarity with firearms.

    d. <u>Fraud In Training</u>

80. The WPS Contract mandated that TCN guards have sufficient training to meet the Contract qualifications.

81. Upon information and belief, Defendant contracted out the training of TCN guards to a for-profit company called "O'Gara".

82. Per the WPS Contract terms, Defendant was responsible for contractor O'Gara's compliance with contract terms.

83. Defendant paid O'Gara for the training it provided to Defendant TCN guards from funds provided by the U.S.A. for the training.

84.  The cost and pricing of the training was set forth in the WPS Contract, Section B, Supplies

Or Services And Prices/Costs, B.3.1 PRICING OF TRAINING, and, in part, stated

> These training rates shall include all costs necessary and applicable (including but not limited to: recruitment, vetting, screening, travel to and from the training site, housing, meals, facilities, instructors, etc.) to fully train an individual for the specified training per the requirements of the contract. The Government will only pay the Contractor the training rate for each qualified individual who completes the course and successfully deploys to Task Order place of performance.

85.  The WPS Contract set forth the training requirements in Section C, Statement Of Work, C.4.3

NECESSARY CONDITIONS, C.4.3.2 TRAINING and, in part, stated:

> The Contractor shall ensure that only personnel trained in accordance with all WPS terms and conditions, including exhibits, attachments, and Task Order specific requirements, are used in performance of work under this contract. This includes the completion of training before deployment and maintaining that level of training throughout the duration of performance under any specific Task Order. …
>
> … Weapon requalification is required for all personnel per DS standards.

86. The WPS Contract in Section J, Exhibit C, Personnel Responsibilities and Qualifications - §7.4

Senior Guard (SRG) (G) (OCONUS) (Non-PSS Qualified) stated that: "This Non-PSS qualified

position/labor category is staffed in accordance with the requirements described below:

… c. The SRG shall maintain weapons qualification, as outlined in this contract, with the Glock,

M4, and Shotgun."

87. WPS, Section J, Exhibit C - Personnel Responsibilities and Qualifications - §7.5 Armed Guard

(Male/Female) (AG) (G) (OCONUS) (Non-PSS Qualified) stated that: This Non-PSS qualified

position / labor category is staffed in accordance with the requirements described below. …The G

shall maintain weapons qualification as outlined in this contract, with the Glock, M4, and

Shotgun".

88. The WPS Contract in Section J, Exhibit A, Article I. General Qualifications, § 1.03 General Qualifications for Local (Host Country) and Third-Country Nationals stated that the guards "must meet respective labor category requirements (See Exhibit E)."

89. The WPS Contract in Section J, Exhibit E, Specifications for Contractor Training Capability, § E.22.3, Basic Guard Training, provided that "The government will consider all contractor personnel assigned to a guard position who have not completed the required training as UNQUALIFIED. The government will assess deductions in accordance with Section H."

90. As to the amount of required training, the WPS Contract in Section J, Exhibit E, Specifications for Contractor Training Capability, § E.22.4, Guard Basic Training Curriculum, stated that the guards be provided with, at "a minimum, the 80-hour Basic Guard Force training" covering topics such as fires and explosions, missions emergency plans, basic guards duties, guard force communications, general orders and post orders, the use of personal equipment, access control equipment use and procedures, observation techniques, static surveillance detection, first aid, use of force/force continuum, and *etc.*

91. Additionally, the WPS Contract in Section J, Exhibit E, Specifications for Contractor Training Capability, § E.22.5, Basic Firearms Training for Guard Positions required that the "Basic Firearm Training shall be a minimum of forty (40) hours … Employees must have satisfactorily previously completed the Basic Firearm Training … if the candidate has obtained the original 40 hours of firearms training, but does not have the necessary training and qualification on all contract required weapons, it is the responsibility of the contractor to conduct familiarization training and qualification on those weapons prior to the candidate being assigned to the contract."

92. The WPS Contract in Section J, Exhibit E, Specifications for Contractor Training Capability, § E.22.7, Firearm Qualifications/Requalification stated that "All contractor guard personnel who

must be armed in the performance of their duties must qualify with the weapon utilizing the standards described in Exhibit F prior to assignment to an armed guard post under this contract. Contractor guard personnel shall re-qualify at least quarterly."

93. The WPS Contract in Section J, Exhibit F, Firearm Qualification Standards sets out the standards required of and need to be maintained by Defendant's TCN guards in relation to the weapons listed in *Exhibit C* above.

94. On March 28, 2014, DoS' Senior Security Task Order Manager sent an email entitled "Range Qualifications" to Defendant's project manager that all Defendant's personnel working under the WPS contract, be given a total of six attempts to qualify in firearm range qualification. The Task Order Manager specifically stated:

> Following guidance from [name redacted], the Task Order 3 Branch Chief, please consider the following when conducting weapons/range qualifications.
>
> All personnel must be given at least three opportunities to qualify. Personnel who fail to qualify within their first three attempts may, using contractor provided and/or funded ammunition, exercise the option to conduct up to three additional qualification attempts for a maximum of six qualification attempts.
>
> Please let me know if you have any questions comments, or concerns.

95. Defendant's training of guards was woefully inadequate and ineffective due to its lack of employing competent, capable and trainable guards.

96. Defendant's training did not satisfy the Contract terms.

97. Defendant's training resulted in having unqualified guards in breach of the Contract terms.

98. Relator has personal knowledge of the breach of this contract term.

99. Just a few examples include and are not limited to:

- Relator and his subordinates were told by guards that they were provided unlimited attempts to qualify on weapons (and not six attempts per DoS' requirement).
- Relator and his subordinates regularly removed from Contract guards because they could not re-qualify after a six-month period, or come close to re-qualifying.

18

- Relator had many TCN guards in training who loaded M4 magazine in rifles backwards resulting in the rifles being jammed. Many TCN guards also dropped the magazines while loading them. This demonstrated they had insufficient training or were not capable of being trained properly.
- Relator witnessed hundreds of cases where TCN guards walked over the firing line during firearm shootings which was an automatic disqualification and a major safety violation. When questioned, the TCN guards did not have basic knowledge of shooting practices despite Defendant's claim that they completed their training either in the guards' home country or Jordan.
- Relator witnessed thousands of cases where TCN guards were caught inadvertently pointing loaded or unloaded firearms at other guards or trainers. Relator also had personal experiences where loaded weapons were pointed at him by the TCN guards.

2. <u>Fraud In Personnel Bios & Representations As To Qualifications</u>

100. The WPS Contract required that Defendant's personnel possess certain qualifications. In connection with that, Defendant was required to submit personnel biographies to the DoS for its employees.

101. The WPS, Section C, Statement Of Work, C.4.3 NECESSARY CONDITIONS C.4.3.1 RECRUITMENT, SCREENING, SELECTION OF PERSONAL PROTECTIVE SERVICE AND PPS SUPPORT SERVICES APPLICANTS, in Section C.4.3.1.1 RECRUITMENT stated that: "The Contractor Shall: • Recruit Qualified Applicants For Various Personnel Positions."

102. WPS, Section J, Exhibit A, Article V. Contractor Screening of Applicants, stated: "The Contractor shall complete the actions and steps in the following process in connection with the screening of applicants."

103. Section 5.01 of this Article stated, in part:

Contractor Screening
…
The Contractor shall conduct a thorough screening of individuals accepted by the COR for the screening process. The Contractor's screening process shall include, but not be limited to:
a. Available past work history.
…
h. And a thorough review of the bio submitted to the COR, Program Office, and/or DSHTPOPS to ensure 100% accuracy and compliance with requirements.

19

104. Defendant submitted false biographies to the DoS in order to place persons in positions for which they did not qualify.

105. Defendant was paid by the U.S.A. based on Defendant's fraud that cover-up the fact that it employed non-qualified personnel under the WPS contract terms.

106. Relator was told by superiors that Defendant had staff designated just to write bios.

107. Integration and Training Instructor fraud - The WPS Contract, Section J, Exhibit C, Personnel Responsibilities and Qualifications - §2.15 Integration and Training Instructor (OCONUS) (IT), identified the required qualifications of the ITI to include: "Two (2) years experience as an instructor in a security field." "Five (5) years experience in protective security assignments." "Two (2) of these years shall have been in a supervisory or in-charge-capacity." "Six (6) months of protective security experience working under the WPPS or WPPS II contract."

108. A training manager for Defendant discovered that Defendant has falsified the bio of an Integration and Training Instructor (ITI), PERSON A.

109. PERSON A's bio represented that he had the necessary instructor and security assignments experience which he did not. The bio misrepresented that that PERSON A had a certain number of "security missions" when he did not. PERSON A had previously worked as a firearm instructor.

110. The training manager reported the misrepresentations to the DoS. DoS questioned PERSON A about his Bio and Person A resigned not long after that. Upon information and belief, DoS removed several other personnel members whom were not qualified and for whom false bios had been created and submitted by Defendant.

111. The training manager who reported this fraud was fired by Defendant in about 2018.

112. Fraud in Guards - As set forth in preceding paragraphs, Defendant employed and trained incompetent and unqualified guards. Relator believes that Defendant must have falsified the bios for many of these persons.

       3.   Fraud to Avoid Deductions

113. The WPS Contract in Section H – Special Contract Requires, set forth a detailed "Deduction" plan. Section H.24 – Deduction Clause stated:

> This plan is intended to provide an effective method to promote effective contractor performance. The contractor, not the Government, is responsible for management and quality control to meet the terms of the contract. The role of the Government is to monitor contractor performance to ensure that contract standards are achieved.
>
> Failure to Provide Services. As with any contract that includes time-and-materials / labor hours components, the Contractor may only bill for hours worked. For an unstaffed position, not only is the contractor prohibited from billing for such services, but also the Government may assess a further deduction, as shown in the first category of the matrix displayed below, due to the serious breach of security created by the unstaffed post.
>
> The government will consider any position staffed by a person who has not received DS approval, does not meet the requirements and qualifications (See Exhibit C) of that position, or is lacking the required equipment for that position, to be UNSTAFFED and may assess deductions accordingly and at the rates displayed in the matrixes below.

114. Section H.24.1 and H.24.2 of the WPS Contract set forth specific priced deductions for less than 100% staffing.

115. Section E of the WPS Contract, E.4 – Contractor Self Reporting Of Non Compliant Services, required that Defendant self-report all contract items it failed to satisfy. The provision stated:

> The Contractor shall submit a narrative as part of their monthly performance report that addresses any noncompliant action for which a deduction could be assessed in accordance with Section H as well as any other action that fails to conform to the terms and conditions of this contract and the applicable Task Order. The Contractor shall identify and explain the cause of any noncompliant action and the Contractor's plan to resolve the issue(s).

116. Upon information and belief, Defendant intentionally failed to report noncompliance with the Contract items set forth in the preceding paragraphs.

117. Defendant did not self-report in order to obtain and/or retain funds obtained by its Contract fraud.

**B. WPS II Contract**

1. Guard Force Fraud

118. The U.S.A. paid Defendant for providing a guard force consistent with the WPS II contract terms.

119. Defendant was paid by the U.S.A. for guard services and training, under the WPS II contract.

120. Defendant typically hired non-U.S. personnel to work as guards and senior guards. The persons are referred to as "third country personnel" ("TCN") in the WPS II Contract. *See* WPS II Contract, Section C, Statement of Work, at 14.

121. As part of the WPS II Contract, Defendant was required to employ only guards whom satisfied certain requirements.

122. These requirements included, and were not limited to:

- Guards passing a physical readiness test, as set forth in the WPS II Contract.
- Guards having at least "Level 2 English level proficiency," as set forth in the WPS II Contract.
- Guards having to pass firearms qualifications and requalification tests, as set forth in the WPS II Contract.
- Guards having sufficient training to satisfy Qualifications, as set forth in the WPS II Contract.

a. Fraud in Physical Readiness Tests

123. The WPS II Contract required that security force personnel pass a physical fitness test during training and requalify at least at six-month intervals.

124. The WPS II Contract in Section C, Statement Of Work, C.7 CONTRACTOR RESOURCE AND WORKING REQUIREMENTS, C.7.1 General Resource Requirements requires that: "A. The Contractor shall: … 3. Ensure that their personnel performing work under this contract comply

with the contract and applicable TO requirements in an effective, timely, efficient, and courteous manner."

125. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, Specifications For Contractor Furnished Training Capability, Section 1 Contractor Training Program, at 1.1.D General, requires that: "The Contractor shall ensure that all candidates successfully complete the required pre-deployment training prior to their deployment to the TO performance location and starting work on the TO."

126. The WPS II Contract in Section C Statement Of Work, at C.10.2.2.7 Pre-employment Physical Fitness Screening, requires that:

> The Contractor shall ensure that all Contractor personnel required to maintain physical fitness standards in accordance with Attachment 1, "Personnel and Canine Qualifications and Responsibilities" take and successfully pass the WPS physical readiness test contained in Attachment 15, "Physical Readiness Test Protocols and Standards" no more than ninety (90) calendar days prior to commencing work under the TO. The minimum passing standard for each position/labor category is identified in Attachment 1, "Personnel and Canine Qualifications and Responsibilities."

127. The WPS II Contract in Section C, Statement of Work, at C.10.4.3 Physical Fitness Testing, requires that:

> A. On a not less than semiannual basis, the Contractor shall conduct physical fitness testing for all Contractor personnel performing work under this contract and subject to the physical fitness standards established in Attachment 1, "Personnel and Canine Qualifications and Responsibilities." This requirement begins upon the individual's first billable day through the end of the three hundred [and] sixty five (365) calendar days following, and then begins again on the first calendar day following while the individual is still working on the TO.
> …
> G. Contractor personnel who fail any portion of the semiannual or Government-directed physical fitness testing will be afforded one (1) retest within seven (7) calendar days of failing. The retest will include all of the required events established in Attachment 15, "Physical Readiness Test Protocols and Standards," even if the individual previously failed at only one event. Contractor personnel who fail any portion of the semiannual or Government directed physical fitness testing shall be considered unqualified to perform services under the contract until such time as they pass the complete test. Contractor personnel who fail the retest allowed above shall be removed from the task order performance location.

128. The WPS II Contact in Attachment 15, DS Physical Readiness Testing Protocols and Standards, sets forth the required testing protocols, to include:

> Section 1: Testing Protocols
> 1.1    *Event Order*
>    1.    Push-ups
>    2.    Sit-ups
>    3.    1.5 mile run
> 1.2    *Breaks between Events*
> Breaks between events shall be no less than 2 minutes and no greater than 15 minutes rest (to include movement between test sites).

129. The WPS II Contact sets forth the qualifications on the physical readiness tests for Senior Guards in Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, at 2.3.5 Senior Guard (SRG), as follows:

> Upon bio approval, and before beginning work on the contract, the SRG shall:
> …
> E. Complete the WPS Physical Readiness Test at the 65% performance level, and maintain that fitness level for the duration of his/her service on the task order.

130. The WPS II Contract sets forth the qualifications on the physical readiness tests for Senior Guards Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, at 2.3.6 Armed Guard (AG) as follows:

> Upon bio approval, and before beginning work on the contract, the AG shall:
> …
> D. Complete the WPS Physical Readiness Test at the 65% performance level, and maintain that fitness level for the duration of his/her service on the task order.

131. Defendant failed materially to comply with the Contract terms for ensuring compliance with the Physical Readiness Testing requirements and protocols set forth in the WPS II contract.

132. Guards commonly failed their initial 6-month re-qualification physical readiness test and were so deficient that Relator and others concluded that it was impossible for them to have passed the physical readiness test in training, as required.

133. Guards did not know what a push-up was when they tried to re-qualify and had not been instructed how to do this exercise. It was evident that they were not shown what a push-up was in training.

134. Contrary to the Contract terms, Defendant continued to employ guards "on base" despite them not passing the physical readiness test.

135. Defendant fabricated passing test scores of the guards so that they could stay "on base" and "on contract".

136. Defendant asked Relator to note failing scores as "diagnostic" or "practice" physical readiness test when the guards failed their actual physical readiness requalification tests.

137. Relator was the person responsible to administer the 6-month requalification tests on the guards.

138. Guards that were overweight and not capable of passing the test, stayed "on base" and "on contract".

139. Guards with injuries and chronic pain that rendered them unable to pass the test stayed "on base" and "on contract".

140. Relator witnessed an overweight guard miserably failed the 1.5 mile run. Nevertheless, the guard remained "on base" and "on contract".

141. In 2018, Relator learned of a guard who Defendant had passed on its administered physical readiness test six months prior which required more than 40 push-ups. At the job site, the same guard failed on requalification and could, at most, do five push-ups. Relator witnessed this.

142. In 2018, Relator learned that Defendant had passed a guard on the physical readiness test which required that the guard run 1.5 miles in about 12 minutes. The guard failed the

requalification by nearly 10 minutes and completed 1.5 mile in about 22 minutes. Relator administered the requalification.

143. A guard failed the 1.5 mile run requalification by more than four minutes despite passing in Jordan just a few months prior to that.

144. In 2019, a guard could not even complete 10 sit-ups despite him passing Defendant-administered physical readiness test six month prior to that. Relator witnessed this incident.

145.  In early 2019, TCN guards indicated to Relator that they had never done push-ups before in their life. This was despite Defendant certifying them as passing the DoS required-physical readiness test which required push-ups.

     b.   Fraud In Level 2 English Level Proficiency Qualification

146. The WPS II Contract had a clear and unequivocal language requirement for guards.

147. The WPS II Contract, in Section C- Statement of Work, at C.10.2.2.6 Pre-employment Language Proficiency Assessment and Certification, states and requires that:

> For all candidates being considered for language requirement positions/labor categories, the Contractor shall submit an official certification for each candidate indicating the current proficiency level (0 – 5) for each respective skill (e.g., reading, listening, speaking, writing, etc.) and applicable TO-defined target language(s) as well as English as measured by the Interagency Language Roundtable/Foreign Service Institute skill level descriptions found at http://www.govtilr.org/Skills/ILRscale1.htm. Candidates whose official or home country (i.e. the country where the candidate was born and raised) language is English do not require English language proficiency testing. In all cases, the test results and certification shall not be more than two (2) years old. The certification shall identify the full name, office address and telephone number of the testing service and be signed and dated by the testing official.

148. The WPS II Contract in Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, at Section 2.3.5 - Senior Guard (SRG), states the required qualifications for a Senior Guard as follows:

> Qualifications:
> For bio approval, the SRG shall meet the following qualifications:

…
B. Level two (2) English language proficiency.

149. The WPS II Contract in Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, at Section 2.3.6 Armed Guard (AG) (G), states the required qualifications for a Senior Guard as follows:

Qualifications:
For bio approval, the AG shall meet the following qualifications:
…
B. Level two (2) English language proficiency.

150. Defendant engaged in contract fraud with respect to the English proficiency requirement as Defendant did on the prior WPS Contract.

151. Defendant had to have submitted fraudulent certifications regarding the Third Country National guards' English proficiency level since many of the guards knew very little, if any, English.

152. The problem became so bad and prevalent that, in early 2019, Relator, in the presence of a DoS Regional Security Officer, dropped a $100 bill on the ground and then slowly asked a Peruvian guard to pick it up and told him he could keep it. The guard did not understand and just stared.

153. In or around 2018, a guard was questioned by a RSO from DoS about what to do in a Code Red. The guard responded by just repeating the term "Code Red" and could say nothing else.

154. In or around 2018, Defendant's training manager gave basic medical training to an entire class consisting 25 to 30 TCN guards, which was a required in-service/refresher training course. After the training, the training manager questioned the guards about topics covered and many were not able to understand and/or answer basic questions. Relator was present and witnessed the session.

155. On another occasion, when Relator was present, emergency response team medics provided basic training. Guards were not able to understand and/or answer basic questions.

156. In 2018 and 2019, at many occasions, the TCN guards were disqualified at Relator's Baghdad firearm range because they did not understand basic firearm commands from the firearm instructors. Many TCN guards did not even understand what "cease fire" meant. Relator and the firearm instructors had to walk over to the guards to physically stop them from firing.

157. The TCN guards did not understand how many rounds of fire that they have to shoot based on the instructions from firearm instructors. Most of them shot too many rounds or too few than what was instructed.

158. The TCN guards were given a print-out of course of fire cards for them to read and familiarize themselves with basic firearm range rules. Despite this, many TCN guards did not know the basic rules because they had no ability to read and understand the print-out.

    c.   Fraud In Firearms Qualifications

159. The WPS II Contract required that guards possess certain skills to ensure that they were competent and capable to provide the Contract-required security and protective services.

160. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, in Section 1.1.D.– General states and requires that: "The Contractor shall ensure that all candidates successfully complete the required pre-deployment training prior to their deployment to the TO performance location and starting work on the TO."

161. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability at Section 10 Training Requirements for Guard Force (G) Personnel, for required Basic Guard Training states and requires that:

    10.1 Basic Guard Training
    …
    D. All armed guards will qualify with the weapons specified in SOW – Attachment One, *Personnel Qualifications and Responsibilities,* and as specified by task order.

E. Any Contractor personnel assigned to a position who has not successfully completed the required training for that position shall be considered unqualified and therefore be unbillable.

162. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, at Section 12 - Firearm Qualification/Requalification (All Labor Categories), requires and states:

A. All armed contractor personnel shall qualify with their assigned weapon(s), as specified in SOW – Attachment One, *Personnel Qualifications and Responsibilities*, and by task order, under the standards described in SOW – Attachment Three, *Firearms Qualification Standards* prior to being issued or assuming duty with a weapon under this contract. Contractor personnel shall not deploy to the task order performance location without possessing current qualifications on all TO required weapons. Thereafter, Contractor personnel shall requalify according to the standards contained in SOW – Attachment Three and the schedule below:

1. "P" [protective services personnel] category personnel shall re-qualify within three months from their last qualification date.

2. "S" [support personnel] category personnel shall re-qualify within six months from their last qualification date.

3. "G" [guard force] category personnel shall re-qualify within six months from their last qualification date.

…

D. All WPS candidates in initial training will have three (3) opportunities to qualify with required weapon(s). If the candidate qualifies on one of these three opportunities, then they can declare that score for record and step off of the firing line.

E. If the candidate does not qualify during one of the three opportunities during initial training then they are to be removed from training. The candidate who does not qualify on a given weapon during initial training may come back through the entire training course at a later date and attempt to qualify again. Any attempt at requalification/certification will be at the discretion of the Contractor who will bear all additional costs for ammunition used in requalification/certification of the individual.

F. Individuals at the Task Order performance location who fail to requalify during one of the three opportunities will not be allowed to be armed. Any decision to allow the Contractor to retrain the individual will be made by the Contracting Officer. All costs of retraining, to include weapons usage and ammunition, shall be borne by the Contractor.

163. By an email dated December 5, 2017, a DoS Supervisory Special Agent and Regional Security Officer Informed Defendant:

29

Effective immediately SOC will no longer be allowed to run their personnel through 6 courses of fire prior to achieving a passing score. We now will adhere to the current standards for the WPS II contract which specifies that a shooter must achieve a qualifying score within three interactions. This standard is applied across the board for all SOC personnel operating under TO 3 and 4.

164. Defendant engaged in contract fraud by employing guards whom were incapable of passing the weapons qualifications as required in the Contract.

165. Defendant, at its BDSC range, further engaged in fraud by allowing guards to have unlimited attempts to pass the weapons qualifications test. Guards regularly told Relator and his subordinates at Relator's BESF range, about that and asked why they were not given the same opportunity when trying, but failing, to requalify.

166. Many guards were so incapable of passing the weapons qualifications test when requalifying, it was clear to Relator and his subordinates that they could not have passed the test during in training.

167. Shooting range score documents from the Jordan range showed that the Guards record passed on the "so-called" third and final weapons qualifications test. The range score documents record for the "first two" attempts were far worse than the final attempt in which they passed. This disparity could only be the result of cheating by contractor officials. Defendant's leadership was aware of that.

168. In late 2018, the TCN guards from BDSC range had to get qualified at the Relator's shooting range on Embassy grounds for a short period of time. Relator and another training manager witnessed the weapons qualifications tests being administered for a short period of time. BDSC guards were given more attempts by BDSC trainers than what was allowed to by the WPS II Contract. One guard trainee only passed on his 5th attempt. Another only passed on his 6th attempt.

169. Defendant did not report or disclose to the DoS the Defendant's Contract noncompliance.

170. Around the same time Defendant fired Relator, Defendant re-deployed back to Baghdad more than 80 TCN guards, whom previously failed to weapons-quality under Relator and his staff, and who Relator complained about to Defendant and DoS representatives.

    d.   <u>Fraud In Training</u>

171. The WPS II Contract mandated that guards have sufficient training to meet the Contract qualifications.

172. Upon information and belief, Defendant contracted out the training of TCN guards to for-profit companies called "O'Gara" and "Tier 1 Group".

173. Per the WPS II Contract terms, Defendant was responsible for contractors O'Gara's and Tier 1 Group's compliance with contract terms.

174. Defendant paid O'Gara and Tier 1 Group for the training they provided to Defendant TCN guards from funds provided by the U.S.A. for the training.

175. WPS II Contract in Section B, Supplies or Services and Prices/Costs, B.14 Training, provides that the "Training costs shall be negotiated and priced at the task order level."

176. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability Specifications For Contractor Furnished Training Capability, Section 1 Contractor Training Program at 1.1.D states and requires that Defendant is responsible for guard training: "The Contractor shall ensure that all candidates successfully complete the required pre-deployment training prior to their deployment to the TO performance location and starting work on the TO."

177. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, Section 10 Training Requirements for Guard Force (G) Personnel, at 10.1.E <u>Basic Guard Training</u> states and requires that Defendant not charge the U.S.A. for personnel who do not successfully complete training: "Any Contractor personnel assigned to a position who has not

successfully completed the required training for that position shall be considered unqualified and therefore be unbillable."

178. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, Section 10.3 Basic Firearms Training for Guard Positions, states in sub-section (b) that the 'TCN armed guards shall complete an eighty (80) hours firearms training and qualification course … ".

179. The WPS II Contract in Section J, Attachment Two, Specifications for Contractor Training Capability, Section 12 Firearm Qualification/Requalification (All Labor Categories), states and requires that Defendant not arm a guard who does not requalify and that only the U.S.A. can decide whether Defendant can retrain the guard: "F. Individuals at the Task Order performance location who fail to requalify during one of the three opportunities will not be allowed to be armed. Any decision to allow the Contractor to retrain the individual will be made by the Contracting Officer. All costs of retraining, to include weapons usage and ammunition, shall be borne by the Contractor."

180. Defendant passed guards in training who could not have passed the firearms qualifications without Defendant cheating as set forth in preceding paragraphs.

181. In addition to not passing the firearms qualifications, guards demonstrated that the Defendant-provided training was woefully ineffective and contract noncompliant for not providing sound and competent training.

182. For example, in 2018, a TCN guard loaded his Glock 19 pistol backward which jammed the magazine.

183. In June 2019, a TCN guard had a negligent discharge of a Glock 19 pistol at a manned entry gate. In another incident in June 2019, a TCN guard had a negligent discharge of his rifle and sustained a gunshot wound to his leg.

184. Relator witnessed numerous cases where TCN guards were caught inadvertently pointing loaded or unloaded firearms at other guards or at trainers.

185. Defendant failed to disclose the failure of the guards' training and manipulation of tests to ensure that guards passed without the required qualifications.

   2.   Fraud In Personnel Bios & Representations As To Qualifications

186. The WPS II Contract required that Defendant's personnel possess certain qualifications. In connection with that, Defendant was required to submit personnel biographies to the DoS for its employees.

187. The WPS II, Section C, Statement Of Work, C.7 CONTRACTOR RESOURCE AND WORKING REQUIREMENTS, in Section C.7.1 General Resource Requirements stated that "The Contractor shall: … 3. Ensure that their personnel performing work under this contract comply with the contract and applicable TO requirements in an effective, timely, efficient, and courteous manner.".

188. The WPS II, Section J, Attachment Two, Specifications for Contractor Training Capability, Section 1 Contractor Training Program, in Section 1.1. General stated that "D. The Contractor shall ensure that all candidates successfully complete the required pre-deployment training prior to their deployment to the TO performance location and starting work on the TO."

189. The WPS II, Section J, Attachment Two, Specifications for Contractor Training Capability, Section 8 PSS Training Requirements provides that "B. Any Contractor personnel assigned to a

position/labor category who has not successfully completed the required training for that position shall be considered unqualified for that position, and therefore be unbillable."

190. The WPS II, Section J, Attachment Two, Specifications for Contractor Training Capability, Section 9 Training Requirements for Support (S) Position provides that "B. Any Contractor personnel assigned to a position who has not successfully completed the required training for that position shall be considered unqualified, and therefore be unbillable."

191. The WPS II, Section J, Attachment Two, Specifications for Contractor Training Capability, Section 10 Training Requirements for Guard Force (G) Personnel provides that "E. Any Contractor personnel assigned to a position who has not successfully completed the required training for that position shall be considered unqualified and therefore be unbillable."

192. Defendant submitted false biographies to the DoS in order to place persons in positions for which they did not qualify.

193. Defendant was paid by the U.S.A. based on Defendant's fraud that cover-up the fact that it employed non-qualified personnel under the WPS II Contract terms.

194. Relator was told by superiors that Defendant had staff designated just to write bios.

195. Deputy Operation Manager – Security fraud – The WPS II Contract, Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, §2.1.5 Deputy Operations Manager – Security (DOMSEC) (P), identified the required qualifications of DOMSEC to include: "a Bachelor's degree from an accredited institution and seven (7) years of applicable work experience" which include:

> i. A minimum of five (5) years of this experience must have been work in planning, evaluating, analyzing, and implementing government security-type programs, specifically personal protection, emergency response team, or guard force.

      ii.   A minimum of one (1) year of this experience must have been protective security experience under WPS II or any of its predecessor contracts (i.e., WPS, WPPS, or WPPS II).

     iii.   A minimum of two (2) years of this experience must have been supervisory experience.

196. DOMSEC has to also "A. Attend and successfully complete the protective security specialist (PSS) training course, guard training course, or both as required by the task order", "B. Qualify with the Glock-19, M4, M203, M240, M249, and Remington 870 shotgun, re-qualifying as required by the task order", and "D. Complete the WPS Physical Readiness Test at the 65% performance level, and maintain that fitness level for the duration of his/her service on the task order."

197. Defendant falsified the bio of DOMSEC PERSON 1 who did not have seven years of applicable work experience as required by WPS II Contract. PERSON 1 also failed firearm qualification re-tests and Defendant's physical readiness test administered on her in Virginia. This is after Defendant fraudulently passed her for the physical readiness test in Baghdad, Iraq. In Virginia, PERSON 1 only scored 26 out of the needed 51 sit-ups and ran 1.5 mile in 16:46 as opposed to the needed 15:45. She failed both the sit-ups and 1.5 mile run and barely passed push-ups with a minimum score of 20. Defendant subsequently made her DOMSEC after allowing her to sit for retest in which she managed to somehow perform the required 51 sit-ups and shaved off two minutes in her 1.5 mile. Subsequently, due to a fraud she committed in a guard qualification, PERSON 1 was removed from her DOMSEC position by the DoS and was given DoS' "Lack of Confidence" certification.

198. In 2018, Defendant also falsified the bio of another DOMSEC, PERSON 2. In the bio that Defendant submitted to DoS for approval, Defendant claimed that PERSON 2 had seven years applicable work experience as required by WPS II Contract. However, PERSON 2 only had one

year of such experience. In or about January 2019, Defendant demoted PERSON 2 after DoS started scrutinizing bios of Defendant's personnel. PERSON 2 resigned shortly thereafter.

199. Deputy Operations Manager – Facilities and Support (DOMFS) fraud – The WPS II Contract, Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, §2.1.6 Deputy Operations Manager – Facilities and Support (DOMFS) (S), identified the required qualifications of DOMFS to include:

> A. Attend and successfully complete the NPSS training course, as specified in SOW – Attachment 2, *Training*.
> B. Qualify with the Glock-19 and M4, re-qualifying as required by the task order.
> …
> D. Complete the WPS Physical Readiness Test at the 50% performance level, and maintain that fitness level for the duration of his/her service on the task order.

200. Defendant falsified the bio of PERSON 3, a DOMFS. PERSON 3 did not have the contract-required trainings and prior experience. Relator witnessed PERSON 3 admitting to her subordinate that PERSON 3 was not even qualified to do the subordinate's job. In or about mid-2018, PERSON 3 was kicked off the Contract by DoS for incompetence.

201. Training Manager fraud – The WPS II Contract, Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, §2.7.2.1 Training Manager (TM)(P), identified the required qualifications to include: "B. Must possess a minimum two (2) years experience as an instructor in a security field" and "C. Must possess a minimum of seven (7) years experience in protective security assignments."

202. Defendant falsified the training manager (PERSON 4) bio which it submitted to the DoS. PERSON 4 worked as an ITI under Relator. PERSON 4 had no background experience in security assignments and he was never an instructor in a security field, but Defendant made PERSON 4 a training manager in BDSC.

203. When PERSON 4 worked as an ITI under Relator, he was caught in BESF's firearm range, changing a TCN guard's shooting records from "fail" to "pass". PERSON 4 deleted another firearm's instructor's record to pass the TCN Guard. The Range Master witnessed the incident. When Relator was told about this incident, Relator banned PERSON 4 from the range. Relator specifically complained about the incident to Defendant. Despite the complaint, Defendant promoted PERSON 4 as training manager.

204. When PERSON 4 became the training manager for the BDSC, the BDSC guards' firearm qualifications' rate became higher than usual and Defendant applauded PERSON 4's performance.

205. Defendant said that PERSON 4 had found the "magic bullet".

206. What really happened was that PERSON 4 (with approval from Defendant's management) provided the guards with unlimited numbers of attempt to weapons qualify.

207. The guards were told by PERSON 4 that they could shoot until they qualify.

208. Defendant encouraged the fraud by PERSON 4.

209. PERSON 4 said in Relator's presence that a training manager should never fail any TCN guards and that even if the guards failed, the training manager must give them passing scores.

210. Training Coordinator fraud - The WPS II Contract, Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, §2.7.2.2 Training Coordinator (TC)(P), identified the required qualifications to include: "C. Must possess five (5) years experience as an instructor in a security field" and "D. Must possess a minimum of three (3) years in protective security assignments."

211. In June 2018, Defendant promoted PERSON 4, referred to above, as a training coordinator. As noted above, PERSON 4 had no background experience in security assignments and he was

never an instructor in a security field. Defendant falsified PERSON 4's bio that it submitted to the DoS.

212. Guards fraud – The WPS II Contract, Section J, Attachment One, Personnel and Canine Responsibilities and Qualifications, §2.3.5 Senior Guard (SRG) stated that a senior guard "must possess a minimum of five (5) years of military, law enforcement, or armed commercial guard force supervisory experience or five (5) years of armed guard experience on WPS II or any of its predecessor contracts (i.e., WPPS, WPPS II, or WPS)." §2.3.6 Armed Guard (AG) stated that a guard "Must possess a minimum of three (3) years of military, law enforcement, or armed commercial guard force experience, specifically including physical security and access control matters."

213. Defendant falsified the bios of its TCN senior guards and guards which were submitted to the DoS.

214. In around 2019, A TCN guard from Kenya conveyed to Relator that he had never shot a gun and that his only "guard" experience was standing in front of a library in Kenya with an unarmed AK-47.

3. Fraud To Avoid Deductions

215. The WPS II Contract in Section H, Special Contract Requirements, in H.26 and H.26.1 Deductions, set forth a detailed deduction plan wherein Defendant was to be penalized for not meeting specified Contract terms, including staffing and having qualified staff.

216. H.26.2 of the WPS II Contract set forth deductions for unacceptable guard performance.

217. The WPS II Contract, Section E – Inspection And Acceptance, at E.4, Contractor self reporting of non compliant services, required that Defendant come forward to report itself on terms of the Contract for which it was not complying. In part, the Contract states:

> The Contractor shall submit a narrative as part of their monthly performance report that addresses any noncompliant action for which a deduction could be assessed in accordance with Section H as well as any other action that fails to conform to the terms and conditions of this contract and the applicable Task Order. The Contractor shall identify and explain the cause of any noncompliant action and the Contractor's plan to resolve the issue(s).

218. Upon information and belief, Defendant intentionally failed to report noncompliance with the Contract items set forth in the preceding paragraphs.

219. Defendant did not self-report in order to obtain and/or retain funds obtained by its Contract fraud.

## V.    TERMINATION IN RETALIATION FOR ENGAGING IN PROTECTED ACTIVITY

220. In November 2017, Relator, in writing to Defendant's Operations Manager objected and reported specific WPS contract violations by one of its Training Managers as well as other misconduct items relating to the Training Manager's dishonesty, lack of candor, and refusal to follow directives. The written reported ended as follows:

> The aforementioned deficiencies illustrate [Training Manager's] lack of professionalism and work ethic along with a disregard of DoS policies, directives, SOC SOPs and Training Section best practices. As a result of [Training Manager's] direction and leadership many man-hours must now be spent on correcting the HTSOS, ERT Refresher Training, Weapons Training Sign-in Sheets and PRT Records. This includes contacting Chantilly for the deletion of a large number of records and the Training Office re-scanning and uploading corrected records.

221. Relator's report also documented the Training Manager's contract fraud by personally conducting an unscheduled Physical Readiness Test of a DOMSEC to ensure that a Defendant candidate for DOMSEC would pass the examination.

222. Defendant's Operations Manager never responded to Relator.

223. Defendant subsequently promoted the Training Manager as Training Coordinator.

224. In 2017 and 2018, on many occasions, Relator complained to Defendant's Training Director about the language deficiencies of the TCN guards.

225. In or around November 2017, the DoS modified the WPS Contract by Task Orders 3 and 4, which divided up the training and manning of the guard force into two separate forces. Task Order 3 was designated for Baghdad Embassy Security Forces ("BESF") and Task Order 4 for Baghdad Diplomatic Support Center ("BDSC").

226. Relator supported this decision of the DoS, with anticipation that Defendant would be more compliant on and accountable for its actions on the WPS II Contract.

227. Relator was appointed the Training Manager at BESF.

228. In or around December 2017, DoS, in writing, instructed Defendant that, under the WPS II, Defendant's guard personnel under Task Orders 3 and 4 had to weapons-qualify within three opportunities and not within six opportunities previously allowed.

229. The only exception to this directive was for M-249 weapon qualifications, where personnel were allowed six iterations to achieve a passing score.

230. In or January 2018, Defendant's DOMSEC/Acting Operations Manager in writing ordered Relator to provide a specific guard with more than three attempts to weapons qualify. The guard failed his previous firearm qualifications and his previous qualifications were administered by Relator. Relator did as ordered by the Acting Operations Manager. Despite given three additional attempts, the guard was not able to qualify.

231. In or around January 2018, Relator together with another BESF's Training Manager, conducted a WPS II contract briefing on guard training with the following Defendant management officials in attendance: the two Directors of Training, the two Operations Managers, and the two Project Managers.

40

232. The following DoS officials also were in attendance, the Regional Security Officer ("RSO"), the Government Technical Monitor ("GTM"), and the Overseas Protective Operations Officer.

233. During the briefing, Defendant's Training Managers, the Relator and the other Training Manager, reported that they had serious concern regarding the quality of guards sent to them. They reported that they anticipated a significant number of guards to fail the physical readiness test and not weapons-qualify. Defendant's management officials responded that Relator and his peer were being too pessimistic and that they, the Defendant's management officials, had confidence in the initial training provided to the guards in Jordan.

234. After the briefing concluded and the DoS representatives left, Defendant's management officials expressed strong dissatisfaction, as well as anger, towards Relator and the other training manager.

235. The next day, Defendant's Training Director, with Project Manager with him, approached Relator and expressly ordered Relator to the effect: "do whatever it takes to pass the guards". Relator was threatened to the effect that "your head is on the chopping block" and that "you better make the guards qualify". Relator responded that he would do whatever he could do to get job done within the contract requirements. Relator firmly indicated that he would not engage in any unlawful contract fraud.

236. At the various times when Relator objected to the unlawful conduct and/or reported on it, Relator made it known that Defendant was getting paid by the U.S.A. by cheating and engaging in the unlawful conduct.

237. Relator referred to the task orders that Defendant was getting paid for as a result of its Contract fraud.

238. In January 2018, Relator, as the person who administer the six-month requalification physical readiness test on the guards, was instructed by Defendant's Project Manager to note guards' failing scores as "diagnostic" or "practice" physical readiness test when the guards failed their actual physical readiness requalification tests.

239. Relator objected to the instruction, but he was warned by the Project Manager to strictly follow his order. Relator objected indicating that the Project Manager was asking him to do something unlawful and that the instruction was not allowed by the Contract.

240. In March 2018, Relator had a conference call with Defendant's Operations Manager and Project Manager. Both of them were concerned with the high failure rate of the TCN guards' in firearm qualifications at the Relator's BESF range.

241. Defendant's Project Manager directly threatened to fire Relator if he did not get the guard to weapons qualify. Relator responded that he would do everything possible within the Contract requirements, but he would not violate the law, lie and not breach the Contract requirements.

242. Relator was directly told to by the Project Manager to record only the passing scores of the TCN guards and regard the failed attempts as mere "familiarization fire" or "practice attempts".

243. This directive if followed would have violated the terms of WPS II Contract.

244. Relator responded to the effect that he would not engage in that fraud and that Defendant was engaging in Contract fraud.

245. Defendant's Officials demanded that Relator follow their instructions.

246. Following this conference call, Relator, by an email dated March 16, 2018, and directed to Defendant's Operations Manager, documented the Defendant's directive, that the directive was not proper, and asked for confirmation in writing, stating:

    Boss,

Just want to get confirmation on the M-249 re-qualification going forward. It was my understanding that you were going to consult RSO Pate for additional guidance/approval. I would just like to confirm that your direction is to have all GF AMCITS and TCN's shoot up to 3 attempts with the M-249, but only record passing scores. Those who do not achieve a passing score will not be recorded on the Range Report and will be considered "Familiarization Fire". DoS Firearms standards and Training best practices mandate that prior to attempting any qualification Shooters must declare and Instructors must confirm that they are either attempting a for record qualification or are conducting training/practice. To allow a passing score to dictate if a course of fire was conducted for record or a "FAM Fire" is contrary to best practice/SOP and could be viewed as unethical by the client. I am concerned this could cause DoS to call into question previous or ongoing qualifications. We will of course, follow your direction and are providing this information for your consideration. We have Range operations tomorrow and need to know how we will proceed.

247. On the same day, the Operations Manager responded to Relator by confirming Defendant's directive to engage in contract fraud:

> It is directed by the PM to begin qualifying all GF personnel. The COR took all M 249 out of the towers and directed familiarization on firing for all GF except the M249 teams for Condor Defense.
> <u>Shoot all GF personnel for qualification as per direction from the PM.</u>

(Emphasis added.)

248. In around May 2018, Defendant fired the BDSC Training Manager, after he reported that the Defendant had allowed an Integration & Training Instructor ("ITI") to fabricate his bio to work in the ITI position. The reason Defendant cited for firing the BDSC Training Manager was something like "loss of confidence."

249. Defendant replaced the fired BDSC Training Manager by promoting as Training Manager the ITI who worked with Relator whom Relator had reported previously for contract fraud.

250. During this time, Relator became alarmed about the contract fraud going on at the BDSC shooting range. Relator also started looking at the shooting scores of TCN guards training in Jordan.

251. Relator was alarmed because his job had been threatened by Defendant and he wanted to justify that he was doing everything in compliance with WPS II Contract and that the guards were unqualified.

252. As a step to justify his claim that the quality of the TCN guards' were unqualified, the Relator began emailing the previous test qualifications results of the TCN guards' training in Jordan, including, the number of qualifications attempts and failures to both Defendant Management Officials and to DoS representatives.

253. Relator sent the emails to the DoS representatives because they were equally concerned about the high number of guards failing qualifications at the BESF range. Relator wanted them to know that the guards that Defendant employed were not qualified and that Defendant engaged in contract fraud shenanigans in order to be deploy them to the job site.

254. On September 22, 2018, Relator was summoned to a meeting by Defendant's Operations Manager where he threatened to fire Relator and his range staff if the passing rate at the BESF did not improve. Relator responded that he was complying with Contract requirements, that he would not engage in unlawful conduct and that he knew that BDSC trainers were not Contract-compliant at their range. A DOMSEC for Explosives Detection Canine was present during the meeting.

255. After that meeting, on September 22, 2018, Relator sent an email to Defendant's Operations manager and cc'd the Deputy Operational Manager for Security and another Operations Manager. The first two bullet points in the email explained the disparity due to the rampant Contract fraud going on at the BDSC shooting range. In that pertinent part, Relator reported:

> Boss:
>
> I'd like to address the concerns expressed by [Defendant's Project Manager] and [Senior Vice President] regarding the pass rates for shooters here at the BEC. In particular, the disparity between our pass rates and those at BDSC.
>
> The following points need to be considered:

- The COR at BDSC has directed that shooters be allowed to "practice until they pass". They are effectively given unlimited attempts on all weapons systems *(on qualification days)*, while BEC maintains a strict 3 attempt ONLY policy - per DoS here. The only training permitted once a qualification has commenced at the BEC is after a second attempt failure and we are only allowed ONE practice before a third attempt. In addition to this, shooters are permitted to "practice"" between 1st and 2nd qualification attempts at BDSC. Per the contract, shooters are not permitted this at the BEC. The BDSC Range procedures have been personally verified by the Range Master here [name removed] with the Range Master at BDSC [name removed] and I confirmed this with the TM at BDSC.
- The Training Section raised the issue with both Corporate and DoS (on many occasions) that it was ill-advised to return to 3 attempts for the Guards if they had to shoot all 3 systems. We are now seeing these individuals return to re-qualify again, with the attendant failure rates expected.

256. After the meeting, Relator also wrote a "memorandum for record" that was read and signed by his Training Manager and his Range Master. In part, the "memorandum for record" stated:

I would like to address you all concerning a meeting I had today with the OM [named removed] regarding Weapon Qualification Pass Rates here at the BEC. The OM passed a message from [name removed] (above) who stated that he was not happy about pass rates here on the BEC compared with those at BDSC. He went on to say that if the pass rates did not improve [name removed] had threatened to "fire" both myself and the range staff he perceived as being responsible for the failures.

I would like to highlight the fact that BDSC has for some time now, been operating under different standards and guidelines to those enforced here at the BEC. As an example, M249 qualifications at BDSC are shot using ground level target stands instead of the 48 inch stands in use at BEC. In addition to this the COR assigned to BDSC has stated that shooters there could have multiple practice iterations "until they qualified" with the 249 and other systems. Here at BEC and as you're all aware, shooters are strictly limited to 3 attempts. In the process of enforcing our standards we have naturally incurred a higher failure rate than at BDSC.

257. Around the same time in September 2018, Defendant deployed a new group of TCN guards to Relator's BESF grounds. This group was mainly from African countries, with some from Peru and India. These guards, per WPS II Contract requirements, were supposed to have been firearm qualified in their respective home countries or in Defendant's training facility in Jordan. However, the guards failed miserably in their re-qualifications at Relator's BESF firearm range.

258. This new group of the TCN guards lacked significant and required knowledge in weapon handling and in English language proficiency.

259. In or around October 2018, Relator complained about the lack of qualifications of the new guards to Defendant's stateside Training Director and told him about how even BESF's range master complained to Relator that the guards had no basic firearm skills. The Training Director just told Relator to focus on getting the guards qualified anyway he could.

260. Defendant ignored Relator's complaints and kept deploying sub-standard TCN guards to Relator's BESF grounds.

261. Many of these guards failed their re-qualifications in the BESF range and were sent back to Jordan for re-training. Months later, most of these guards got re-deployed back to the BESF range after their purported training in Jordan and they still failed their firearm re-qualifications at the BESF range. They could not have legitimately qualified in Jordan.

262. In or around October 2018, in a staff meeting with the Defendant Management Officials present, Relator reported that fraudulent qualifications were being performed in Jordan by Defendant's personnel and that the TCN guards who failed firearm qualifications, and re-qualifications, were being recycled back into trainings and for qualification re-attempts. Relator conveyed clearly that Defendant was acting unlawfully and contrary to the Contract. Relator made it equally clear he refused to engage in the requested unlawful conduct.

263. Relator again reported that BDSC trainers were giving many opportunities for the TCN guards to qualify in firearm and not just the three attempts allowed by WPS II Contract.

264. Relator specifically commented on how he and another Training Manager witnessed the Contract fraud when BDSC trainer and guards had to undergo qualification attempts at the BESF shooting range when the BDSC range was temporarily unavailable.

265. Relator also referred to an example of shooting score sheets from Jordan where 11 out of 21 guards scored the minimum passing score of 32 out of 50. One guard scored seven on the first attempt, four on the second attempt, and then miraculously scored 32 on the third and attempt to pass. The guard only could have passed by Defendant personnel falsifying records.

266. Relator specifically stated that he felt that he would be fired if he did not "play ball and commit fraud" by passing the guards like what BDSC was doing. Relator told them how Defendant's Senior Vice President had threatened to fire Relator and his range staff if the passing rate at the BESF does not improve.

267. Defendant management officials responded by asking Relator to get the guards qualified as per Defendant's senior management's instructions.

268. In around November 2018, the Operations Manager summoned Relator into a meeting and told Relator that he just had a conference call with Defendant's Senior Vice President and Project Manager. The Operations Manager said he wanted to pass a message to the Relator that the Senior VP threatened to fire Relator due to the high failure rate of the guards.

269. Relator, as before, responded to the Operations Manager that he was doing all he could legally and everything possible within the WPS II Contract. Relator again pointed out how Contract fraud was going on at the BDSC range and that he would not act unlawfully like what was going on at the other range.

270. Relator also referred to the fraud going on with respect to weapons qualifications both in training at Jordan and at the BDSC. Relator stated that he would not engage in the fraud and would not violate the Contract.

271. The Operations Manager repeated Defendant's representatives' position that Relator would not have his job if he did not get more guards to re-qualify and that he needed to do whatever was necessary to do it. A DOMSEC for Explosives Detection Canine was present during the meeting.

272. A few hours after being threatened with termination by Defendant, Relator met with the DoS' Senior RSO and another RSO. Relator told the RSOs that he was being forced to commit fraud but would not do it. They told Relator to do what was right and applauded his good work and ethical standards.

273. In or around December 2018, Relator's training team started with a new group of training guards who performed terribly. Many did not know how to operate firearm and their shooting scores were atrocious. The guards told Relator and his staff that they were given unlimited attempts to weapons-qualify when they had their qualifications in Jordan.

274. In or around January 2019, the DoS' RSOs called Relator into a meeting. Relator was asked to provide them with supporting documents that he had to show Defendant's Contract breaches and unlawful conduct.

275. Relator complied with the request and provided the DoS representatives with copies of score sheets and training records from Jordan. Relator also provided more details about how Defendant was covering-up its unlawful conduct.

276. Relator also complained to DoS representatives about new guards that failed to requalify and who clearly could not have qualified legitimately in training in Jordan. Relator warned the DoS representatives that the safety of U.S. personnel as well as the guard force was at risk.

277. In or around January 2019, Defendant's Training Director strongly expressed dissatisfaction with the testing results of Relator's team. The Training Director told Relator that the needed to "innovate" and to stop focusing on the negative. Relator referred to the new batch of guards and

pointed out the deficient training provided to them in Jordan. Relator said that he would not engage in Contract fraud and refused to compromise his integrity. He made it clear again that Defendant was acting unlawfully and get paid for unqualified guards.

278. In or around February 2019, Defendant's Training Director, in-person, with a Project Manager present, ordered Relator to stop passing the TCN guards' previous qualifications score results to the DoS' RSOs.

279. Defendant's Officials told Relator that the BDSC had found the "magic bullet" to get guards to pass and that they expected Relator to do the same and to get the job done. Relator stated that BDSC got its results from cheating and not complying with the Contract terms. Relator warned them that their unlawful actions would "blow up" in their face if the DoS ever investigated since the Defendant was getting paid by the U.S.A. for unqualified guards.

280. Relator also asked the Defendant's Officials to send the BDSC trainers to BESF's range for him and his staff to learn how to achieve the "magic bullet". Upon hearing Relator's request, the Defendant's Officials quickly changed the topic. Relator reiterated that he had personally witnessed BDSC trainers' cheating on the guards' qualifications when they came over to BESF's range when the BDSC's range was temporarily unavailable.

281. In March 2019, Defendant's Deputy Project Manager angrily questioned Relator about why he was failing so many TCN guards. Relator responded, yet again, that he was doing all he could legally and everything possible within the WPS II Contract. Relator again pointed out how Contract fraud was going on at the Jordan and BDSC range. The Deputy Project Manager just responded that Relator had to do everything necessary to get the TCN guards qualify.

282. In March 2019, Relator took a DoS' RSO to his BESF's fire range to see how unqualified the TCN guards were.

283. Relator also spoke to him about how the guards did not understand English. The RSO, in his email dated June 5, 2019 to other Regional Security Officers ("RSO"), the Government Technical Monitor ("GTM"), and the Overseas Protective Operations Officer, noted that "I have personally witnessed several guards that cannot perform the four basic steps of a pistol draw; including one guard that grabbed the top of the slide while drawing his weapon to engage. Not to mention that language problems that I have witnessed."

284. In or around April 2019, the DoS Office of Overseas Protective Operations Training Desk Officer met with Relator and asked him why he stopped sending him the TCN guards' previous qualifications results. Relator responded that he was specifically ordered to by the Defendant.

285. Relator also took this DoS representative to the range to show that the guards were not qualified and the extent of Defendant cheating the U.S.A and getting paid for it.

286. Later, in or around April 2019, Defendant's Training Director met with Relator and his staff. The Training Director angrily said that there was rat amongst them and that he knew that someone from BESF was talking to the DoS.

287. The Training Director blamed Relator and his staff for TCN guards' failures and specifically asked Relator and his staff not to focus on the guards' past records and previous failures. Relator and his staff were told to take all necessary actions to qualify the guards.

288. On or about April 30, 2019, Relator travelled home to Maryland for rest and recuperation ("R&R"). He was set to return to Baghdad and resume his duties on June 12, 2019.

289. By email dated May 16, 2019, the Training Director sent an email to Relator and another Training Manager which, in part stated:

> Serious discussions need to be had, regarding the inability to train individuals to achieve passing scores on belt-fed weapons. This has now elevated to executive levels among SOC HQs. This is a situation that continuously comes up with BEC and there has to be a solution.

***

Accepting a problem as the norm, is just like choosing to ignore it. Both are recipes for disaster. I fear this is the mindset that has returned to the Training Department. Please educate me otherwise. This issue needs to be addressed immediately.

290. The next day, May 17, 2019, Relator responded by email, stating:

Boss,

I don't believe anyone feels like Guards are just "going to fail" based on their previous history and we are therefore giving up on them. We work with each Guard for many hours and I know that I and the guys take it hard when we have put hours and hours of effort and truly believe they will pass only to have some of them fail their third attempts. If it appears we are focused on their previous track records or failures I can assure you that although it has been brought up and discussed in the past (with you and others) that is not considered when a man needs our help to get through re-qualification. Their past records were only looked at in an effort to try and understand any and all possible explanations for the high failure rates with the belt-feds for TCNs and to find a solution. We have been trying multiple different training methods and using many resources to come up with solutions and never intended the metrics to be an excuse for failure. I spoke with the Training Team several weeks before departing for R&R and asked them to "dig deeper" and for suggestions that they felt could lower the failure rate. I haven't given up and don't believe the Training Team has done so and we will continue to look for the solution to the high failure rate and I believe we will succeed.

291. On May 23, 2019, Defendant's DOMSEC forwarded an email from Defendant's Operations Manager out to BESF training staff cautioning against anyone having direct communications with DoS representatives.

292. Relator did not respond to the email.

293. On June 5, 2019, Defendant terminated Relator by phone.

294. Defendant's Training Director told Relator that he was being terminated due to his failures to get the guards weapons-qualified.

295. Around the same time Defendant fired Relator, Defendant re-deployed more than 80 TCN guards, who Relator failed and removed in firearm qualification and who Relator specifically complained to Defendant and DoS representatives about, back to Relator's BESF ground.

296. After his termination, Relator and DoS representatives had several communications.

51

297. The DoS representatives indicated that they would support Relator in a whistleblower action against Defendant.

## JURISDICTION & VENUE

298. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 because this action arises under the laws of the United States.

299. This Court has personal jurisdiction over the Defendant pursuant to 31 U.S.C. § 3732(a).

300. Venue is proper in this District because Defendant transacts business in this District and can be found in this judicial district.

## VIOLATIONS OF LAW

301. The facts constituting, supporting and evidencing Defendant's violations of the False Claims are not derived from a publicly disclosed source.

## COUNT I - VIOLATION OF THE FALSE CLAIMS ACT: FALSE CLAIMS, 31 U.S.C. § 3729(a)(1)(A) – ON WPS CONTRACT & WPS II CONTRACT

302. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 300, above, as if fully set forth herein.

303. In violation of 31 U.S.C. § 3729(a)(l)(A), Defendant knowingly presented, or caused to be presented, for payment or approval, materially false or fraudulent claims (i.e., invoices for payment above) based upon the false representations and fraud set forth in the Statement of Facts.

304. Defendant presented its claims for payment knowing that they were materially false.

305. By virtue of the acts described above, Defendant knowingly presented, or caused to be presented, to officers, employees, or agents of the U.S.A. false or fraudulent claims for payment or approval.

306. Defendant staffed positions with unqualified and/or unapproved personnel, and submitted fraudulent claims to the U.S.A. to deceive and mislead it to believe that personnel were qualified when they were not.

307. Defendant engaged in material fraudulent actions against the U.S.A. in making the false claims regarding staffing, qualifications, and/or training.

308. The U.S.A. paid Defendant as a result of its false claims and statements.

309. Defendant submitted false claims to get paid for services it failed to perform in compliance with Contract terms.

310. Relator informed Defendant that it was jeopardizing the safety of U.S. personnel as a result of its conduct.

311. The U.S.A, unaware of the foregoing circumstances and conduct of Defendant, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendant, which resulted in the U.S.A. being damaged in an amount to be established at trial or upon motion.

312. The U.S.A. was misled by the actions of Defendant, and, as a result, paid Defendant's false claims.

313. The U.S.A. suffered damages of the amounts it paid to Defendant.

314. Relator cannot at this time identify all of the false claims for payment and related false statements that were caused by Defendant's conduct. Relator has no control over or access to the records in Defendant's possession.

315. Per the False Claims Act, Defendant must be held accountable and be ordered to pay damages and penalties as prescribed in the False Claims Act.

316. Relief Requested – Relator requests that he be awarded all damages allowed to him under the False Claims Act, including awards and penalties. Relator also seeks pre-and post-judgment interest, and an award of attorney's fees and costs.

## COUNT II - VIOLATION OF THE FALSE CLAIMS ACT: FALSE STATEMENTS, 31 U.S.C. § 3729(a)(1)(B) - ON WPS CONTRACT & WPS II CONTRACT

317. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 315, above, as if fully set forth herein.

318. In violation of 31 U.S.C. § 3729(a)(l)(B), Defendant engaged in a course of conduct in which it knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims (i.e., documents representing that Defendant had met the requirements and qualifications for performance) under the WPS Contract and WPS II Contract and/or to induce the DoS to approve the Defendant's claims and to induce the U.S.A. to pay or approve Defendant's false or fraudulent claims.

319. Defendant's false and fraudulent course of conduct in which it knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim that represented that Defendant had met the requirements and qualifications for performance under the WPS Contract and WPS II Contract.

320. By virtue of the acts described above, Defendant made, used, or caused to be made or used, false records and statements to get the false and fraudulent claims allowed and paid.

321. Defendant staffed positions with unqualified and/or unapproved personnel, and submitted fraudulent statements to the U.S.A. to deceive and mislead it to believe that personnel were qualified when they were not.

322. Defendant engaged in material fraudulent actions against the U.S.A. in making the false statements regarding staffing, qualifications, and/or training.

54

323. The U.S.A. paid Defendant as a result of its false claims and statements.

324. The U.S.A, unaware of the foregoing circumstances and conduct of Defendant, and unaware of the falsity of the records and or statements made, used, or caused to be made or used by Defendant, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted it, which resulted in the U.S.A. being damaged in an amount to be established at trial or upon motion.

325. The U.S.A. suffered damages of the amounts it paid to Defendant.

326. Relator cannot at this time identify all of the false claims for payment and related false statements that were caused by Defendant's conduct. Relator has no control over or access to the records in Defendant's possession.

327. Per the False Claims Act, Defendant must be held accountable and be ordered to pay and damages and penalties as prescribed in the False Claims Act.

328. Relief Requested - Relator requests that he be awarded all damages allowed to him under the False Claims Act, including awards and penalties. Relator also seeks pre-and post-judgment interest, and an award of attorney's fees and costs.

## COUNT III – DEFENDANT CONCEALED AND IMPROPERLY AVOIDED AN OBLIGATION TO PAY PENALTIES TO THE STATE DEPARTMENT IN VIOLATION OF THE FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G) - ON WPS CONTRACT & WPS II CONTRACT

329. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 327 above, as if fully set forth herein.

330. As discussed above, the WPS Contract and WPS Contract 2 contained a Deduction plan that specifies the penalties that the DoS imposed for any failure by Defendant to satisfy contract terms.

331. Defendant covered-up its Contract noncompliance with respect to qualifications and training of guards.

332. Defendant staffed positions with unqualified and/or unapproved personnel and submitted fraudulent statements and claims.

333. Defendant's conduct was materially fraudulent and done with the intent to avoid having deductions as required under the Contracts.

334. Pursuant to 31 U.S.C. § 3729(a)(1), Defendant is liable for three times the amount of penalties it improperly avoided with the material false statements.

335. Relief requested – Relator requests that he be awarded all damages allowed to him under the False Claims Act, including awards and penalties. Relator also seeks pre-and post-judgment interest, and an award of attorney's fees and costs.

## COUNT IV - VIOLATION OF THE FALSE CLAIMS ACT: RETALIATION AGAINST RELATOR, 31 U.S.C. § 3730(h)

336. Relator repeats and re-alleges the allegations contained in Paragraphs 1 through 334, above, as if fully set forth herein.

337. The False Claims Act ("FCA") is a statutory scheme designed to discourage fraud against the federal government. Congress amended the FCA in 1986 to add an anti-retaliation provision to protect whistleblowers. The current iteration of that provision is 31 U.S.C.§ 3730(h)(1), which states:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

338. The purpose of Congress' amendment of the FCA to protect whistleblowers was to assure those like Relator who are considering exposing fraud that they are legally protected from retaliatory acts.

339. Defendant retaliated against Relator for engaging in conduct and activity that is protected under the False Claims Act.

340. Defendant knew of Relator's protected activity and conduct and threatened him because of that before it terminated him.

341. Defendant offered a pretext for terminating Relator.

342. Relator specifically told Defendant that it was acting unlawfully and contrary to the requirements in the WPS and WPS II Contracts.

343. Relator specifically told Defendant that he would not engage in the fraudulent conduct and that he would comply with the Contract requirements.

344. Relator specifically reported to Defendant that it was getting paid by the U.S.A. due its Contract fraud and that its conduct was unlawful.

345. Relator specifically advised Defendant of the fraud that was occurring at the Jordan training location and BDSC range and that Defendant was qualifying guards that were not qualified under the Contract terms.

346. Relator objected to Defendant's fraud and Contract noncompliance and billing the government for unqualified guards and for deficient training.

347. Relator told the DoS that Defendant was charging the U.S.A. based on fraudulent statements and being paid by the U.S.A as result of the fraud.

348. The DoS told Relator to continue to provide it with information so that it could investigate the Defendant's fraud.

349. In furtherance of his action to stop the False Claims Act violations, Relator spoke to, provided information to, and shared documents with the Defendant's Management about the unlawful activity and Contract fraud.

350. In furtherance of his action to stop the False Claims Act violations, Relator spoke to, provided information to, and shared documents with the DoS showing the fraud and Contract noncompliance.

351. Defendant was aware of Relator's contact with the DoS about the fraud and Contract noncompliance.

352. Defendant expressly ordered Relator to cease providing the DoS about weapons training results.

353. Defendant expressly told Relator and his staff that there was a "rat" talking to the DoS.

354. Defendant expressly sent emails to Relator and his staff directing that no one have unauthorized communications with the DoS.

355. Relator's protected activity with the DoS involved investigatory matters that reasonably could lead to a viable False Claims Act case.

356. Relator informed the DoS that Defendant's fraud was jeopardizing the safety of U.S. personnel.

357. Relator had an objective reasonable belief that Defendant was engaged in fraud against the U.S.A. and contrary to the WPS and WPS II Contract terms.

358. Relator took appropriate action to report and object to Defendant's conduct that violated the False Claims Act.

359. Relator's actions and efforts were designed and intended to stop at least one violation of the False Claims Act.

360. Relator's actions and efforts were designed and intended to prevent Defendant from engaging in fraud against the U.S.A.

361. In furtherance of a potential qui tam action, Relator did far more than report a concern to a supervisor of a mischarging to the government. Relator engaged in protected activity when he made clear to Defendant that there was a reasonable possibility of litigation by complaining that Defendant's conduct was illegal.

362. Defendant retaliated against Relator as a result of Relator's actions.

363. Defendant discriminated against Relator in the terms and conditions of his employment for attempting to stop Defendant's violations of the False Claims Act when Defendant terminated Relator's employment.

364. Defendant-stated reason for terminating Relator was pretextual.

365. Relator has suffered substantial damages as a result of Defendant's wrongful conduct. Under 31 U.S.C. §3730(h), Relator is entitled to compensation for damages he sustained as a result of Defendant's conduct.

366. Relator suffered lost wages and benefits as a result of Defendant's unlawful conduct that was intentional and in reckless disregard of the protections afforded to him under the False Claims Act.

367. Relator suffered compensatory damages as result of Defendant's unlawful conduct. Defendant humiliated and shamed Relator. Defendant caused Relator to suffer worry and anxiety about not being able to provide for himself and his family, about doing what was right and standing-up against Defendant's fraud, and about the safety and welfare of U.S. personnel. Defendant's unlawful conduct interfered and disrupted adversely his well-being, emotionally and professionally. Relator now has to cope with the stress of having a "termination" on his record for the very first time ever.

368. Relief requested – Relator requests that he be awarded the damages allowed to him under the False Claims Act, including twice the amount of his lost wages and benefits, front pay (in not

reinstated), compensatory damages and for emotional distress, and all other available relief.

Relator seeks for pre- and post-judgment interest, and an award of attorney's fees and costs.

Respectfully submitted,

Stephen B. Lebau (Bar # 07258)
LEBAU & NEUWORTH, LLC
606 Baltimore Avenue – Suite 201
Towson, Maryland 21204
tel. 443.273.1203
fax. 410.296.8660
sl@joblaws.net
*Attorneys for Relator*

## REQUEST FOR JURY TRIAL

Relator requests that a jury of his peers hear and decide this case.

Respectfully submitted,

Stephen B. Lebau (Bar # 07258)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of August, 2019, I served this Complaint & Request for Jury Trial by postage-paid First Class U.S. Mail, upon the following:

1. The Honorable William P. Barr
   U.S. Attorney General
   U.S. Department Of Justice
   950 Pennsylvania Avenue, NW
   Washington, DC 20530-0001

2. The Honorable Robert K. Hur
   U.S. Attorney For District of Maryland
   Office of U.S. Attorney
   36 S. Charles Street, 4th Floor
   Baltimore, MD 21201

Stephen B. Lebau (Bar # 07258)