IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA, <u>ex</u> <u>rel.</u> PAUL SOVITSKY,     *

      Plaintiff,     *

      *     Civil Action No. GLR-19-2281

v.     *

SOC LLC,     *

      Defendant.

* * *

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Defendant SOC LLC's ("SOC") Motion to Dismiss Plaintiff-Relator Paul Sovitsky's Complaint (ECF No. 46). The Motion is ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant in part and deny in part SOC's Motion to Dismiss.

## I.    BACKGROUND[1]

### A.    <u>Factual Background</u>

This False Claims Act ("FCA") action arises from SOC's alleged fraudulent billing with respect to its duty to provide security services to the United States Embassy in Baghdad, Iraq. (Compl. at 2, ECF No. 1).[2] SOC is a government contractor that was

---

[1] Unless otherwise noted, the Court takes the following facts from Relator Sovitsky's Complaint, (ECF No. 1), and accepts them as true. <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).

[2] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

awarded at least two contracts with the Department of State's Worldwide Protective Services Program ("WPS"). (Id. ¶¶ 23, 34). Under these contracts, SOC was required to supply security guards with specified skills to international locations, including the U.S. Embassy in Baghdad, Iraq. (Id. ¶¶ 28, 37, 43, 44, 49).

Plaintiff-Relator Sovitsky is a subject matter expert in firearms, anti-terrorism, and protective services training. (Id. ¶ 10). He is a former employee of SOC, where he served as the Training Manager at the U.S. Embassy in Baghdad from December 2013 to June 2019. (Id. ¶¶ 12, 37). In his position, Sovitsky managed and supervised training of the guard force, personal protection services, and support personnel. (Id. ¶ 14). He also oversaw in-service training, physical readiness, and firearms requalification of the guard force. (Id. ¶¶ 14, 28–30).

Sovitsky alleges that SOC committed unlawful fraud as to two of its WPS contracts with the Department of State, referred to hereafter as WPS I and WPS II. (Id. at 2, 9, 22). Under these contracts, any guard who did not possess the necessary qualifications as set forth in WPS I and II was not permitted to remain on the embassy grounds and was not to be charged to the Government. (Id. ¶¶ 113–15, 215–17). The qualifications for guards under WPS I include: (1) level 2 English language proficiency; (2) prior military, law enforcement, or guard force experience; (3) familiarity with Contract-issued weapons; and (4) sufficient training, as set forth in the WPS I contract. (Id. ¶¶ 49–50). The hiring limitations under WPS II were like those of WPS I, with the additional requirements that the guards: (1) pass a physical readiness test; and (2) pass firearms qualifications and requalification tests, as set forth in the WPS II contract. (Id. ¶¶ 121–22). Sovitsky alleges

that SOC billed and received payment for guards in Baghdad who it knew did not meet these qualifications. (Id. ¶¶ 134–36, 164, 238). Specifically, Sovitsky maintains that SOC falsified records to bill for guards who did not pass physical readiness and firearms qualifications tests. (Id. ¶¶ 123–45; 159–70).

### 1.    Physical Fitness Testing Fraud

The WPS II agreement dictated that guards be deemed "unqualified to perform services" until they pass a complete physical fitness test. (Id. ¶ 127). For those who failed this test, a retest was to be offered "within seven (7) calendar days of failing." (Id.). If a guard then failed the retest, he was to "be removed from the task order performance location." (Id.). Sovitsky's job duties included administering the guards' six-month physical fitness evaluation. (Id. ¶ 137). He alleges that despite the contractual requirements, SOC submitted invoices for guards who failed the fitness requirements. (Id. ¶¶ 134, 303, 346). He also asserts that several individuals gave him direct orders to falsify physical fitness records. (Id. ¶ 136). For instance, in January 2018, Sovitsky alleges that SOC's Project Manager instructed Sovitsky to fabricate the guards' scores by redesignating any failing scores as "diagnostic" or "practice" so that the guards could stay "on base and on contract." (Id. ¶¶ 131–45, 238, 242). Sovitsky objected to this practice and explained to the Project Manager that this was unlawful and contrary to the WPS Contract. (Id. ¶ 239). In response, the Project Manager warned Sovitsky "to strictly follow his order." (Id.).

### 2.    Firearms Qualification Fraud

Sovitsky next alleges that SOC leadership gave the guards unlimited attempts at passing the weapons qualifications test (even though the WPS II contract only afforded

each guard three opportunities)[3] and ordered Sovitsky to falsify shooting records. (Id. ¶¶ 162, 165, 230, 242). Specifically, in March 2018, during a conference call with SOC's Operations Manager and Project Manager, the Project Manager ordered Sovitsky to only record passing weapons scores and to "regard the failed attempts as mere 'familiarization fire' or 'practice attempts.'" (Id. ¶ 242). Sovitsky asserts that during this phone call, and later via email, he told both the Operations Manager and Project Manager that these actions amounted to unlawful contract fraud. (Id. ¶¶ 236–37, 244, 246). As a result of Sovitsky's non-compliance with what he perceived to be unlawful orders, he alleges that the Training Director, Projector Manager, and Operations Manager threatened to fire him if he did not "do whatever it takes to pass the guards." (Id. ¶¶ 235, 241, 254, 268, 271).

### 3.    Department of State Involvement

After being threatened with the loss of his job, Sovitsky met with the Department of State's Senior Regional Security Officer and another Department of State official to inform them that that he was "being forced to commit fraud." (Id. ¶ 272). According to Sovitsky, they told [him] to do what was right and applauded his good work and ethical standards." (Id.).

In or around January 2019, the Department of State asked Sovitsky to provide them with evidence to show that SOC had breached their contract and engaged in unlawful conduct. (Id. ¶ 274). Sovitsky complied with this request by providing the Department with "copies of score sheets and training records." (Id. ¶ 275). However, it appears from the

---

[3] Sovitsky notes that there was one exception for M-249 weapons where guards were allowed six opportunities to achieve a passing score. (Compl. ¶ 229).

Complaint that after finding out about Sovitsky's actions, SOC leadership ordered him to stop giving the scorecards to the Department of State in February of 2019. (Id. ¶ 278).

In March 2019, Sovitsky brought Department of State officials to his shooting range to show them how unqualified the guards were. (Id. ¶ 282). According to Sovitsky, many guards could not perform basic firearm skills. (Id. ¶ 259). About a month after the Department's visit, SOC's Training Director met with Sovitsky and others, and "angrily said that there was a rat amongst them." (Id. ¶ 286). SOC's Deputy Operations Manager for Security later sent an email "cautioning against anyone having direct communications with [Department of State] representatives." (Id. ¶ 291). Sovitsky complied with this order. (Id. ¶ 284).

In or around April 2019, a Department of State officer met with Sovitsky to find out why he had stopped providing their office with the guards' qualification results. (Id.). Sovitsky then explained that he was ordered by SOC to cease all communications with the Department. (Id.).

On June 5, 2019, SOC contacted Sovitsky by phone to terminate him, citing his failure to qualify the guards as the reason for his termination. (Id. ¶ 293–94). After his termination, Sovitsky alleges that Department of State representatives "indicated that they would support [him] in a whistleblower action against [SOC]." (Id. ¶ 297).

## B.   Procedural History

On August 7, 2019, Plaintiff-Relator Paul Sovitsky filed this qui tam action on behalf of the United States against SOC. (ECF No. 1). The United Stated filed a Notice declining to intervene in the suit on June 6, 2023. (ECF No. 18). Sovitsky served the

Complaint on SOC on September 28, 2023. (ECF No. 25). The Complaint alleges four violations of the False Claims Act ("FCA") for: false claims under 31 U.S.C. § 3729(a)(1)(A) (Count I); false statements under 31 U.S.C. § 3729(a)(1)(B) (Count II); knowingly and improperly avoiding an obligation to pay money to the Government under 31 U.S.C. § 3729(a)(1)(G) (Count II); and retaliation under 31 U.S.C. § 3730(h) (Count IV) (Compl. at 52–56). Sovitsky seeks all allowable monetary damages under the FCA, as well as his costs and attorney's fees. (Id. ¶ 368).

On April 19, 2024, SOC filed the instant Motion to Dismiss. (ECF No. 46). Sovitsky filed his Opposition on June 19, 2024, (ECF No. 47), and SOC filed its Reply on July 19, 2024, (ECF No. 48).

## II.    DISCUSSION

### A.    Standard of Review

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, see United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979) (finding dismissal of complaint proper because plaintiffs' "conclusory allegations" of discrimination were unsupported by "reference to particular acts, practices, or policies"), or legal conclusions couched as factual allegations. Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, on a motion to dismiss" under Rule 12(b)(6). Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013). In considering a Rule 12(b)(6) dismissal, however, the court may properly consider documents "attached or incorporated into the complaint," E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011), as well as documents "attached to

the motion to dismiss, so long as they are integral to the complaint and authentic." <u>Philips v. Pitt Cnty Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009).

Suits brought under the False Claims Act sound in fraud, and thus are also "subject to Federal Rule of Civil Procedure 9(b), which requires that claimants plead fraud with particularity" to survive a motion to dismiss. <u>Harrison v. Westinghouse Savannah River Co.</u>, 176 F.3d 776, 783–84 (4th Cir. 1999). To satisfy this requirement, a plaintiff "must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). "These circumstances are often referred to as the 'who, what, when, where, and how' of the alleged fraud." <u>United States ex rel. Taylor v. Boyko</u>, 39 F.4th 177, 189 (4th Cir. 2022) (quoting <u>United States ex rel. Wilson v. Kellogg Brown & Root, Inc.</u>, 525 F.3d 370, 379 (4th Cir. 2008)).

**B.    <u>Analysis</u>**

SOC argues that Sovitsky's FCA claims under 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), (a)(1)(G), and 31 U.S.C. § 3730(h) should be dismissed for failure to plead plausible allegations of fraud and failure to allege retaliation under Federal Rules of Civil Procedure 12(b)(6) and 9(b). (Def.'s Mem. Supp. Mot. Dismiss ["Mot."] at 7, ECF 46-1). At bottom, the Court will grant SOC's Motion to Dismiss Count III but will deny the Motion as to all other counts.

The FCA protects the government treasury by "impos[ing] civil liability on persons who knowingly submit false claims for goods and services to the United States." <u>United States ex rel. Beauchamp v. Academi Training Ctr.</u>, 816 F.3d 37, 39 (4th Cir. 2016). To

prevent fraud that might otherwise evade detection and to supplement government enforcement, the FCA's qui tam provision permits a private individual, known as a whistleblower or a relator, to file a civil lawsuit on behalf of the government against those who defraud the federal government. United States ex rel. Sheldon v. Forest Lab'ys, LLC, No. ELH-14-2535, 2024 WL 4544567, at *20 (D.Md. Oct. 22, 2024). Under the statute, a successful relator is entitled to collect a portion of the government's recovery and their attorney's fees. See 31 U.S.C. § 3730(b); see also Schindler Elevator Corp. v. United States ex rel. Kirk, 563 U.S. 401, 404 (2011); United States ex rel. Bunk & Ammons v. Gov't Logistics N.V., 842 F.3d 261, 265 n.3 (4th Cir. 2016); ACLU v. Holder, 673 F.3d 245, 246–51 (4th Cir. 2011) (describing history and current provisions of FCA).

### 1.    Counts I & II: False Claims & False Statements

In Counts I and II of his Complaint, Sovitsky alleges that SOC knowingly submitted false claims and made false statements to the Department of State regarding embassy guards' qualifications in violation of 31 U.S.C. § 3729(a)(1)(A) and (B). (Compl. ¶ 307). SOC asserts that Sovitsky's allegations do not satisfy the Rule 9(b) pleading standard. (Mot. at 15). At this stage, the Court agrees with Sovitsky.

Sections 3729(a)(1)(A) and (B) of the FCA prohibit any person from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" and "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

To prevail on a claim under these sections of the FCA, Sovitsky must allege four elements: "(1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money." United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 193 (4th Cir. 2022) (quoting Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 788 (4th Cir. 1999)).[4] Neither party contests the fourth element so the Court will only address whether the first three elements are plausibly alleged.

### a.    Falsity

As to the first element, a relator may allege a false statement or fraudulent course of conduct through an "implied certification theory" of liability. United States ex rel. Badr v. Triple Canopy, Inc., 857 F.3d 174, 176 (4th Cir. 2017); see also United States ex rel. Fadlalla v. DynCorp Int'l LLC, 402 F.Supp.3d 162, 189 (D.Md. Sept. 5, 2019) ("Relators may satisfy the element of falsity by plausibly averring that the defendant 'impliedly certifies compliance with all conditions of payment.'") (quoting Universal Health Services, Inc. v. U.S., 579 U.S. 176, 180 (2016)). As the Supreme Court explained in Universal Health Services, Inc., "when a defendant submits a claim, [he] impliedly certifies compliance with all conditions of payment." 579 U.S. at 180. If the defendant fails to disclose his non-compliance with the contract, such action may be sufficient to render his

---

[4] Claims arising under 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) are analyzed under the same four-part standard. United States ex rel. Nicholson v. MedCom Carolinas, Inc., 42 F.4th 185, 193 (4th Cir. 2022).

claim false if the defendant knows that his violation is material to the Government's payment decision. Id.

To the extent Sovitsky relies on an implied certification theory of liability, the Court finds the Fourth Circuit's opinion in Triple Canopy II directly on point with the case at bar. There, the Government awarded security firm Triple Canopy a contract to provide security services to military bases in Iraq. United States v. Triple Canopy, Inc. ("Triple Canopy II"), 857 F.3d 174, 175 (4th Cir. 2017). Under the terms of the contract, Triple Canopy was required to ensure that all guards complied with specific trainings and weapons qualifications. Id.; United States ex rel. Badr v. Triple Canopy, Inc., 950 F.Supp.2d 888, 892 (E.D.Va. 2013), aff'd in part, rev'd in part sub nom., United States v. Triple Canopy, Inc., 775 F.3d 628 (4th Cir. 2015), cert. granted, judgment vacated sub nom., Triple Canopy, Inc. v. United States ex rel. Badr, 579 U.S. 924 (2016), aff'd in part, rev'd in part sub nom., United States v. Triple Canopy, Inc., 857 F.3d 174 (4th Cir. 2017). However, according to the Government, Triple Canopy brought in guards who were unable to meet these requirements. Triple Canopy II, 857 F.3d at 175. Despite not meeting the requirements, Triple Canopy allegedly falsified scorecards and submitted monthly invoices for guard services. Id. When the United States filed an FCA claim, Triple Canopy argued that the invoices did not contain falsities on their face because they did not require Triple Canopy to certify that its guard services complied with the contract's responsibilities. Id. at 178. The Fourth Circuit disagreed, explaining that "although Triple Canopy knew its 'guards' had failed to meet a responsibility in the contract, it nonetheless requested payment each month from the Government for those 'guards.'" Id. As a result, the court

reasoned that "anyone reviewing Triple Canopy's invoices "'would probably—but wrongly—conclude that [Triple Canopy] had complied with core [contract] requirements.'" Id. (quoting Universal Health Services, Inc., 579 U.S. at 189).

Thus, the Fourth Circuit found that in the context of security services contracts, when a security contractor submits an invoice for guard services the contractor "impliedly certifies" that it complied with core contractual obligations, including weapons and training qualifications. Triple Canopy II, 857 F.3d at 176. The contractor's failure to disclose noncompliance with marksmanship requirements was sufficient to render its claim for payment as false under the FCA. Id.

Here, just as in Triple Canopy II, the Court finds Sovitsky's allegations sufficient to support an implied certification theory under the FCA. In both cases the central purpose of contract at issue was to provide security services to U.S. bases abroad. (Compl. ¶¶ 26, 41, 119). More specifically, the WPS II contract provides that the "primary objective of [the] contract [was] to secure best-in-class [security] services." (Id. ¶ 43). Sovitsky, like the Government in Triple Canopy II, alleges that SOC knew it was not complying with its core responsibilities under the WPS I and II contracts, such as ensuring that guards pass physical readiness and firearms qualifications and re-qualifications tests, yet nonetheless SOC requested payment from the Government. (Compl. ¶¶ 122, 131, 134–36, 185, 306). As part of this scheme, Sovitsky asserts that SOC asked him "to note failing [physical readiness] scores as 'diagnostic' or 'practice' physical readiness tests when the guards failed their

actual . . . tests." (Id. ¶ 136).[5] Further, Sovitsky claims that SOC permitted guards to have unlimited attempts at passing their weapons qualifications tests even though the contract only allowed for three attempts. (Id. ¶¶ 162, 165). In so doing, SOC was able to bill for guards that the contract otherwise prohibited. (Pl.'s Opp'n Mot. Dismiss ["Opp'n"] at 4, ECF No. 47). Because the Complaint alleges that SOC violated core contractual requirements and submitted claims for payment without notifying the Government of its noncompliance, just as the Government alleged in Triple Canopy II, at this stage the Court finds that Sovitsky adequately pled falsity under the implied certification theory. (Compl. ¶¶ 306–09); see also DynCorp Int'l LLC, 402 F.Supp.3d at 190 (finding that relator alleged implied certification theory of liability by asserting that defendant violated core provisions of its contract with the government and submitted claims for reimbursement nonetheless).

> **b.     Scienter**

Under the FCA, a defendant acts with the requisite scienter if they: (1) have actual knowledge of the falsity of the information; (2) act in deliberate ignorance of the truth or falsity of the information; or (3) act in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A); Boyko, 39 F.4th at 197. To satisfy this element at the motion to dismiss stage, an FCA relator must set forth specific facts that support an inference that the defendant had knowledge of the false claim. United States ex rel. Complin v. N. C. Baptist Hosp., 818 F.App'x 179, 183 (4th Cir. 2020).

---

[5] Sovitsky also alleges that he witnessed a training instructor change a guard's shooting records from "fail" to "pass." (Compl. ¶ 203). SOC later promoted this instructor to manager, applauding his performance and claiming that he had found the "magic bullet" for increasing the guards' firearm qualifications ratings. (Id. ¶¶ 204–09).

Here, the Court finds that SOC, at minimum, acted with reckless disregard as to their compliance with the WPS I and II contracts. Sovitsky states that he witnessed SOC officials knowingly falsify test scores and was personally asked to re-designate any failing scores as "diagnostic" or "practice" tests so that the guards could stay on base and SOC could continue to bill for their services. (Compl. ¶¶ 135–36, 209, 238). Sovitsky further alleges that when he objected to these instructions on the grounds that they violated the terms of the WPS II contract and thus were unlawful, he was "warned by the Project Manager to strictly follow his order." (Id. ¶ 239, 243–45). See United States ex rel. Complin v. N. C. Baptist Hosp., 818 F.App'x 179, 183 (4th Cir. 2020) (noting that factual allegations that an employer instructed an employee to ignore potential regulatory violations can be sufficient to support an inference of scienter).

SOC's argument that only low-level employees were aware of any alleged fraud is unavailing. (Mot. at 27–28). In his Complaint, Sovitsky claims that he reported the unlawful conduct to SOC's training managers, director, and other management officials. (Compl. ¶¶ 236–37, 239, 244, 246). Yet, SOC officials instructed him to "do whatever it takes to pass the guards." (Id. ¶¶ 235–37) (emphasis added). Accepting Sovitsky's allegations as true, as this Court must, the Court finds these allegations sufficient to support the inference that SOC had knowledge of its false claims concerning the qualifications of its guards. Accordingly, Sovitsky has adequately pled scienter at this stage of the litigation.

### c.    Materiality

For the materiality requirement to be satisfied, Sovitsky must allege facts showing that the Government's decision to pay SOC would likely have been affected had it known

of SOC's failure to comply with the weapons and physical fitness requirements of the WPS contracts. United States v. Academi Training Ctr., Inc., 220 F.Supp.3d 676, 681 (E.D.Va. 2016); see also Universal Health Services, Inc., 579 U.S. at 193 (explaining that the materiality standard "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation") (cleaned up) (internal quotation marks omitted). In other words, it is not enough for Sovitsky to allege that SOC breached its contract with the Government; rather, Sovitsky must assert that SOC's breach was so central to the contract that the government would not have paid the claims had it known of SOC's violations. Academi Training Ctr., Inc., 220 F.Supp.3d at 682; Universal Health Services, Inc., 579 U.S. at 196.

SOC contends that Sovitsky fails to satisfy the materiality requirement for his claims because: (1) any alleged violations are of discretionary portions of the WPS contracts; and (2) the Government was aware of SOC's alleged breach of contract and continued to pay SOC's claims. (Mot. at 20–21). The Court finds these arguments meritless. First, as explained earlier, the central purpose of the WPS contracts was for SOC to deploy fully trained and qualified guards to protect certain U.S. Embassies and Diplomatic centers, including Baghdad, Iraq. (Compl. ¶¶ 26, 36, 41, 43). Thus, it strains credulity to argue that the Government's payment decision would not have been affected had the Government known that the guards responsible for protecting U.S. officials in Iraq had not fulfilled their weapons and physical fitness qualifications. See Academi Training Ctr., Inc., 220 F.Supp.3d at 681–82; Triple Canopy II, 857 F.3d at 179 ("[T]he Government's decision to pay a contractor for providing base security in an active combat zone would be influenced

by knowledge that the guards could not, for lack of a better term, shoot straight.") (internal quotation marks omitted) (quoting Triple Canopy I, 775 F.3d at 637–38).

Second, it appears that a few months after Sovitsky made Department of State officials aware of the alleged false scorecards, SOC ordered him to stop sharing information with the Government. (Compl. ¶¶ 274–75, 278). Sovitsky states that he complied with this order. (Id. ¶ 284). As a result, it is unclear to the Court the extent of the Department of State's knowledge of SOC's alleged fraudulent training. Further, as Sovitsky points out, the Government's decision not to intervene in a FCA suit is not dispositive on the issue of materiality. (Opp'n at 12); see Boyko, 39 F.4th at 194 ("While the Government's decision to immediately intervene tends to demonstrate materiality, the inverse is not true. The Government may decide not to intervene simply because its attorneys are swamped, or political considerations are at stake. We cannot presume lack of materiality from such vagaries of fate.") (internal quotation marks omitted) (cleaned up) (quoting Triple Canopy II, 857 F.3d at 179). As the Fourth Circuit found in Triple Canopy II, "[g]uns that do not shoot are as material to the Government's decision to pay as guards that cannot shoot straight." 857 F.3d at 179. Indeed, this Circuit has generally found the falsification of weapons qualification scores to be a material falsehood capable of influencing the Government's decision to pay. See, e.g., id. at 178–79; Academi Training Ctr., Inc., 220 F.Supp.3d at 681–82. Therefore, the Court finds that Sovitsky has alleged sufficient facts to support a finding of materiality.

In sum, Sovitsky has stated a plausible claim under Sections 3729(a)(1)(A) and (B) of the FCA. Accordingly, Counts I and II will proceed.[6]

### 2.    Count IV: Retaliation

Sovitsky alleges that SOC terminated him in retaliation for investigating and exposing SOC's falsification of guard physical fitness and weapons qualification tests in violation of 31 U.S.C. § 3730(h). (Compl. ¶¶ 336–63). SOC argues that Sovitsky's FCA retaliation claim should be dismissed for failure to state a claim. (Mot. at 32). The Court rejects this argument and will deny SOC's Motion to Dismiss Count IV.

To sufficiently plead an FCA retaliation claim under Section 3730(h), an employee must allege facts that support the "reasonable inference" that: "(1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him" because of the protected activity. United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 200 (4th Cir. 2018). Importantly, a plaintiff need not prove the underlying FCA violation because, as the Supreme Court explained, Section 3730(h) protects an employee's conduct "even if the target of an investigation or action to be filed was innocent." Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416 (2005).

---

[6] The Court will dismiss Count III of Sovitsky's Complaint. In Count III, he alleges that SOC concealed and improperly avoided its obligation to pay penalties to the State Department in violation of Section 3729(a)(1)(G) of the FCA. SOC argues that the Court should dismiss this claim because: (1) it is entirely duplicative of Counts I and II; and (2) Sovitsky fails to identify any obligation of SOC to pay penalties to the Department of State. (Mot. at 30–31). In his Opposition, Sovitsky concedes that this claim may be dismissed. (Opp'n at 31 n.19). Accordingly, the Court will grant SOC's Motion to Dismiss Count III.

Moreover, the Fourth Circuit has made clear that a plaintiff's allegations need only meet the pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, not the heightened pleading standard set forth in Rule 9(b). Smith v. Clark/Smoot/Russell, 796 F.3d 424, 433 (4th Cir. 2015). At the motion to dismiss stage, a reviewing court is "obligated to view only the [plaintiff's] pleadings, and to view them generously in the [plaintiff's] favor." Young v. CHS Middle East, LLC, 611 F.App'x. 130, 133 (4th Cir. 2015). For the reasons discussed below, the Court finds that Sovitsky alleges sufficient facts to support each of the elements of his FCA retaliation claim against SOC.

### a.     Protected Activity

Under Section 3730(h), protected activity can be: (1) acts done in furtherance of an FCA action; or (2) efforts to stop an FCA violation. Leverette v. Louis Berger U.S., Inc., No. 22-1891, 2024 WL 2355419, at *1 (4th Cir. May 23, 2024) (quoting United Airlines Inc., 912 F.3d at 200 (4th Cir. 2018)). As to the first category of protected activity, this generally includes investigating and collecting information that could lead to a viable FCA claim. See United States ex rel. Brooks v. Lockheed Martin Corp., 423 F.Supp.2d 522, 530 (D.Md. 2006), aff'd in part, dismissed in part, 237 F.App'x 802 (4th Cir. 2007); United Airlines Inc., 912 F.3d at 200. When determining whether a relator engaged in the second category of protected activity, the Fourth Circuit considers whether the employee acted with an "objectively reasonable belief" that his employer violated or would soon violate the FCA. Id. at 201.

In this case, the Court finds that Sovitsky has sufficiently pled the protected activity element under either category. First, Sovitsky alleges that he investigated SOC's training

fraud by requesting guards' test scores to submit to the Department of State. (Compl. ¶¶ 250–51, 274). Because this is exactly the type of information that could lead to a viable FCA case against SOC, the Court views Sovitsky's investigation of training fraud as "in furtherance of" an FCA action. Second, Sovitsky alleges that he attempted to stop the FCA violations by reporting perceived fraudulent conduct—the fabrication of test results—to SOC supervisors and managers, and the Department of State. (Compl. ¶¶ 238–39, 262; Opp'n at 19). The Court finds that Sovitsky acted with an objectively reasonable belief that SOC was violating the FCA because he alleges that he not only witnessed the falsification of test scores but was also encouraged by both SOC's Project Manager and Operations Manager to do the same. (Compl. ¶¶ 135, 203, 238, 247). See United Airlines Inc., 912 F.3d at 202 (finding that employee had an objectively reasonable belief that his employer was violating the FCA when employee had personal knowledge of the employer's contract fraud and reported the specific illegal conduct to his superiors). Therefore, viewing the allegations in the light most favorable to Sovitsky, the Court finds that Sovitsky has plausibly alleged that he engaged in protected activity.

### b.    Knowledge of the Protected Activity

For an employee to show that his employer has knowledge of his protected activity, he must allege facts that allow the Court to infer that his employer was on notice that FCA litigation was a reasonable possibility. United States ex rel. Parks v. Alpharma, Inc., 493 F.App'x 380, 388 (4th Cir. 2012). Generally, courts may infer that an employer is on notice of a potential FCA action when the employee reports or complains to management about fraudulent conduct with respect to billing. See, e.g., Nifong v. SOC, LLC, 190 F.Supp.3d

549, 559 (E.D.Va. 2016) (finding that plaintiff pled the notice element of an FCA retaliation claim when plaintiff reported to supervisors that defendant's billing practices were fraudulent and should be corrected); United Airlines Inc., 912 F.3d at 203 (finding that plaintiff sufficiently pled that his employer had knowledge of his protected activity when plaintiff alleged that he complained about employer's fraudulent conduct to management numerous times). The Court finds that Sovitsky has met this burden.

Here, as already noted, Sovitsky alleges he made several reports to his supervisors in which he characterized SOC's billing practices as fraudulent on account of the falsified training scores. (Compl. ¶¶ 220–21, 231, 236–39). Because courts in this circuit have generally found such conduct sufficient grounds to infer that an employer was on notice of a potential FCA litigation, the Court concludes that Sovitsky has adequately alleged SOC's knowledge of his protected activity.

### c.    Causation

Finally, for Sovitsky's FCA retaliation claim to survive he must plead facts that support the inference that SOC terminated him because of his protected activity. When determining whether an employer took adverse action against an employee because of his or her protected activity, courts may consider the timeline of events. See United Airlines Inc., 912 F.3d at 203. Specifically, at the motion to dismiss stage, a temporal proximity of three months or less has been found sufficient for at least one court in this circuit to infer a causal nexus between the adverse action and the employer's protected activity. See Nifong, 190 F.Supp.3d at 560 (allegations that plaintiff's employer implemented a schedule adverse to plaintiff nearly twelve weeks after plaintiff reported defendant's fraudulent billing

practices were sufficient to support a causal nexus between the protected activity and adverse action at the motion to dismiss stage).

In the case at bar, Sovitsky alleges that there were, at most, nine weeks between SOC's termination of his employment and his last meeting with Department of State representatives regarding SOC's training fraud. (Compl. ¶¶ 284–93). Thus, in evaluating the timeline of events, the Court finds the temporal proximity sufficient to establish a causal nexus between SOC's adverse action and Sovitsky's protected activity.

In sum, the Court finds that Sovitsky's Complaint states a plausible FCA retaliation claim at this stage of the litigation. Therefore, the Court will deny SOC's Motion to Dismiss as to Count IV.

## III.    CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part SOC's Motion to Dismiss Sovitsky's Complaint (ECF No. 46). SOC's Motion is granted to the extent it seeks dismissal of Count III and denied as to Counts I, II, and IV. SOC shall answer the remaining counts of the Complaint as required by the Federal Rules of Civil Procedure and the Local Rules of this Court. A separate Order follows.

Entered this 8th day of April, 2025.

_____/s/_____
George L. Russell, III
Chief United States District Judge